31 A.3d 191

**MONTGOMERY COUNTY, Maryland**

v.

**Kenneth DEIBLER.**

**No. 120, Sept. Term, 2010.**

Court of Appeals of Maryland.

Oct. 27, 2011.

Wendy B. Karpel, Asst. Co. Atty. (Marc P. Hansen, Acting Co. Atty., and Karen L. Federman Henry, Division Chief of Office of the County Attorney, Rockville, MD), on brief, for Appellant.

Kenneth M. Berman (H. David Leibensperger of Berman, Sobin, Gross, Feldman & Darby, LLP, Gaithersburg, MD), on brief, for Appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, *MURPHY, ADKINS and BARBERA, JJ.

BARBERA, J.

Section 9–615 of the Maryland Code (1999, 2008 Repl.Vol.), Labor and Employment Article ("L.E.") creates a two-part process for compensating temporary partial disabilities that result from work accidents or occupational diseases.[1] First, to

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. L.E. § 9–615 provides:

be eligible for compensation, an employee's "wage earning capacity" while temporarily, partially disabled must be "less" than that employee's pre-disability wage earning capacity. L.E. § 9–615(a)(1). Then, if the employee is found to be eligible for compensation, the compensation owed the employee is calculated by halving the difference between the employee's pre-disability average weekly wage, and post-disability wage earning capacity. L.E. § 9–615(a)(1)(i) & (ii). This case focuses on the first part of the statute. We must determine whether a loss of the ability to work overtime, and its associated loss in overtime compensation, qualifies as a lessening of an employee's wage earning capacity for the purposes of L.E. § 9–615. For the following reasons, we answer that question in the affirmative.

## I.

The parties have stipulated to the material facts of this appeal. Captain Kenneth Deibler, the Appellee, is a firefighter employed by Appellant, Montgomery County ("the County"). Appellee injured his knee on November 28, 2006 and again on March 5, 2008; both injuries occurred in work-related accidents. Those injuries, and the resulting physical restrictions, forced Appellee from his regular duties as a firefighter into a reduced working role.

The parties refer to Appellee's income as an "hourly wage." Before his injuries, Appellee was paid bi-weekly for 96 hours of non-overtime work as a firefighter. After his injuries,

---

(a) *Amount of payment.*—(1) Subject to paragraph (2) of this subsection, if the wage earning capacity of a covered employee is less while temporarily partially disabled, the employer or its insurer shall pay the covered employee compensation that equals 50% of the difference between:

(i) the average weekly wage of the covered employee; and

(ii) the wage earning capacity of the covered employee in the same or other employment while temporarily partially disabled.

(2) The compensation payable under paragraph (1) of this subsection may not exceed 50% of the State average weekly wage.

(b) *Duration of payment.*—The employer or its insurer shall pay the weekly compensation for the period that the covered employee is temporarily partially disabled.

Appellee could not physically perform the tasks of his job or meet the demands of working as a firefighter. He was, therefore, placed on "light duty." He worked 80 hours every two weeks, or 40 hours a week, performing less physically strenuous tasks. His reduction in hours, though, did not affect his salary. The County boosted his hourly wage and maintained all of his cost of living adjustments and benefits, to ensure that he earned the same amount of base pay as he had been making before his injuries.

Appellee, while temporarily partially disabled, experienced a reduction in his overtime hours and overtime compensation. Appellee testified that, before his injuries, he worked 15–20 hours of overtime per week in promotional and training activities, in addition to the biweekly 96 hours of firefighter duties. Payroll records support this, revealing that in the 14 weeks leading up to each injury, Appellee worked an average of 11.9 and 15.4 overtime hours per week, respectively. After the injuries, Appellee was physically incapable of working the same training and promotional overtime activities. Moreover, unlike regular-shift firefighters, firefighters on light duty must receive special approval from a supervisor in order to work overtime hours. Appellee did not receive that approval. While Appellee was working light duty, his average weekly overtime fell to about one hour per week after each injury. As a consequence, and, notwithstanding that the County boosted Appellee's base salary to offset his reduction in hours, Appellee's income dropped significantly. The record shows that, during the 14 weeks preceding his first injury, Appellee earned $2782.63 per week. During the 20 weeks Appellee spent on light duty after his first injury, Appellee earned approximately $2022 per week. In the 14 weeks preceding his second injury, Appellee earned $3049.92 per week. In the 22 weeks Appellee spent on light duty after his second injury, Appellee earned approximately $2278 per week.

Appellee filed separate claims with the Worker's Compensation Commission ("the Commission"), requesting disability compensation for the loss of income stemming from each injury. The Circuit Court consolidated both cases. After a

hearing, at which Appellee testified to the above facts, the Commission ordered that Appellee should receive temporary partial disability compensation for the periods of time in which he worked light duty after both injuries. Thus, implicit in the Commission's order was its determination, pursuant to L.E. § 9–615(a), that Appellee's loss in overtime compensation qualified as a lessening of his wage earning capacity.

The County filed a petition in the Circuit Court for Montgomery County seeking judicial review of the Commission's decision. The County argued that the Commissioner's implied reasoning under L.E. § 9–615(a) runs contrary to the intent of the Legislature. After brief discovery, both parties filed cross-motions for summary judgment. The County argued in its motion that Appellee's base pay was the same as it was before his injuries and, therefore, Appellee could not fulfill the requirement of L.E. § 9–615(a)(1), that an employee's wage earning capacity be "less" while disabled than the employee's pre-disability wage earning capacity. The County took the position that "wage earning capacity" does not include overtime compensation, because overtime is not a guaranteed form of compensation.

The Circuit Court disagreed with the County. The court, by reference to what it viewed as analogous federal law (the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 908(e)), ruled that the term "wage earning capacity" could fairly include overtime compensation. The court reasoned that the County's argument fell out of line with modern employment practice. The court explained that overtime was an integral part of the compensatory package for much of the workforce, including Appellee. The court ruled that overtime compensation was part of Appellee's wage earning capacity. The court therefore denied the County's motion for summary judgment, granted Appellee's cross-motion for summary judgment, and thereby affirmed the Commission's order.

The County noted an appeal to the Court of Special Appeals. Before argument in that court, we issued a writ of certiorari to consider following question:

Does the term "wage earning capacity" include the capacity to earn overtime compensation so that the Commission may include such compensation in the determination of whether an employee's wage earning capacity is "less" while temporarily, partially disabled?

## II.

■ L.E. § 9–745 governs appeals of decisions by the Commission. It provides that, in appellate review of a Commission decision, "the decision of the Commission is presumed to be prima facie correct." We have explained, though, that this presumption does not extend to questions of law, which we review independently. *Wal Mart Stores, Inc. v. Holmes,* 416 Md. 346, 357, 7 A.3d 13, 19 (2010). We do, though, afford the Commission a degree of deference, as appropriate, in its formal interpretations of the Workers' Compensation Act. *See Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 485, 784 A.2d 569, 579 (2001) ("To be sure, the issue of statutory interpretation is for the court to decide, nevertheless, we have recognized that even when such matters are before the court, the [Commission]'s interpretation may be entitled to some deference." (internal quotation marks omitted)).

■ "The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Gardner v. State,* 420 Md. 1, 8, 20 A.3d 801, 806 (2011) (quoting *State v. Johnson,* 415 Md. 413, 421, 2 A.3d 368, 373 (2010)). In that task, we must "look first to the language of the statute, giving it its natural and ordinary meaning." *Holmes,* 416 Md. at 385, 7 A.3d at 36. When the meaning of that plain language is "clear and unambiguous," our interpretive task is at an end. *Id.* at 359, 7 A.3d at 21. But, "when the meaning of the plain language is ambiguous or unclear, we seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based." *Breitenbach,* 366 Md. at 473, 784 A.2d at 572.

When interpreting the Act, additional principles of interpretation enter the equation. Foremost, we recognize that the Act is a remedial statute. *Design Kitchen & Baths v. Lagos*, 388 Md. 718, 724, 882 A.2d 817, 821 (2005). The purpose of the Act is "to protect workers and their families from hardships inflicted by work-related injuries by providing workers with compensation for loss of earning capacity resulting from accidental injury arising out of and in the course of employment." *Howard County Assoc. for Retarded Citizens, Inc. v. Walls*, 288 Md. 526, 531, 418 A.2d 1210, 1214 (1980) (citing *Queen v. Agger*, 287 Md. 342, 343, 412 A.2d 733, 733–34 (1980); *Liggett & Meyers Tobacco Co. v. Goslin*, 163 Md. 74, 80, 160 A. 804, 807 (1932)). Therefore, we have been consistent in holding that the Act must be "construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes." *Lagos*, 388 Md. at 724, 882 A.2d at 821 (quoting *Harris v. Bd. of Educ. of Howard County*, 375 Md. 21, 57, 825 A.2d 365, 387 (2003)).

At the same time, we "may not stifle the plain meaning of the Act, or exceed its purposes, so that the injured worker may prevail." *Breitenbach*, 366 Md. at 473, 784 A.2d at 573 (quoting *Philip Elecs. N. Am. v. Wright*, 348 Md. 209, 212, 703 A.2d 150, 151 (1997)). When the language is plain, we may not invent or infer an ambiguity that does not exist in order to interpret the Act more favorably to the claimant. *Id.* Moreover, the Act itself directs its own interpretation. L.E. § 9–102(a) demands that the statute "be construed to carry out its general purpose." L.E. § 9–102(b) adds that "[t]he rule that a statute in derogation of the common law is to be strictly construed does not apply to this title."

Within this framework, we must determine whether the term "wage earning capacity" in L.E. § 9–615 contemplates compensation earned for overtime work. L.E. § 9–615(a), titled *"Amount of payment,"* provides, in pertinent part: "(1) Subject to paragraph (2) of this subsection, if the wage earning capacity of a covered employee is less while temporarily partially disabled, the employer or its insurer

shall pay the covered employee compensation that equals 50% of the difference between: (i) the average weekly wage of the covered employee; and (ii) the wage earning capacity of the covered employee in the same or other employment while temporarily partially disabled."

Pertinent to the issue we decide, the Act provides no express direction on how the phrase "wage earning capacity" is to be interpreted, either to include or exclude overtime compensation. Wage earning capacity reasonably could be interpreted to include only the capacity to earn guaranteed remuneration for work, which would exclude overtime compensation. Alternatively, wage earning capacity reasonably could be interpreted to encompass the capacity to earn any type of remuneration an employee receives for work, including overtime compensation. Because the phrase is subject to more than one equally reasonable interpretation, it is ambiguous. *Gardner*, 420 Md. at 11, 20 A.3d at 808; *see Reier v. State Dep't of Assessments & Taxation*, 397 Md. 2, 26–27, 915 A.2d 970, 984–85 (2007) ("[The law] does not state expressly whether 'full back pay' embraces benefits.... It strikes us that the competing parties' arguments present two ... reasonable alternative interpretations of the statute, making the statute ambiguous." (internal citations and quotation marks omitted)). To resolve this ambiguity, we must look past the plain language of the Act and "employ all the resources and tools of statutory construction at our disposal."[2] *Reier*, 397 Md. at 27,

---

2. One rule of statutory construction does not apply in the present case. We speak here of the rule that, when "the language of a statute is susceptible of two reasonable constructions, an administrative practice which has been followed by officials of the State for a long period of time has a very persuasive influence on the judicial construction of the statute." *Hope v. Baltimore County*, 288 Md. 656, 662, 421 A.2d 576, 579 (1980); *see also, Comptroller v. Am. Cyanamid Co.*, 240 Md. 491, 506, 214 A.2d 596, 604 (1965); *Rogan v. Baltimore & Ohio R. Co.*, 188 Md. 44, 58, 52 A.2d 261, 268 (1947). We recently referred to this same principle, with some slight variation on the theme: "We give deference to a consistent and long-standing construction given a statute by an agency charged with administering it[,]" and in determining how much deference to afford that construction, we consider, among other factors, "the duration and consistency of the administrative practice." *Sta-*

915 A.2d at 985 (quoting *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484, 487 (2004)).

The phrase "wage earning capacity" appears nowhere in the Maryland Code, other than in L.E. § 9–615. Furthermore, neither "wage," nor "earning," nor "capacity" is defined in Subtitle 1, the Act's Definition and General Provisions subtitle. Moreover, the Act does not mention the word "overtime," in any context.[3]

---

*chowski v. Sysco Food Serv. of Baltimore, Inc.,* 402 Md. 506, 517, 937 A.2d 195, 201 (2007).

Appellee urges here, as he did in the Circuit Court, to apply that principle in the present case. He declares that the Commission for some time now has construed L.E. § 9–615(a), just as the Commission did in his case, to include overtime pay in the calculation of "wage earning capacity." Appellee attempted to build a record in the Circuit Court of such *"long-standing construction"* by the Commission, by appending to his motion for summary judgment 22 Commission orders, which span seven years and were authored by nine different Commissioners. In Appellee's view, those orders are evidence of a Commission practice of awarding temporary partial disability compensation when an employee's overall income decreases during the period of disability, regardless of overtime availability.

At oral argument before us, we probed counsel for the County and Appellee about this asserted long-standing practice. Counsel for the County said that the issue "is relatively new" and "has been before the Commission in the last three or four years." Counsel added that the Commission used to "trend in the County's favor," in construing L.E. § 9–615(a)(1) to exclude overtime in ascertaining "wage earning capacity," but more recently has "trended away from the County's favor." For his part, counsel for Appellee agreed that the trend has been in favor of including overtime pay in the calculation, adding that "there was a commissioner who has actually changed her opinion" about how to construe the statute.

This record is not sufficiently strong to support application of the principle Appellee urges upon us. Of the 22 orders in the record, we can find only one that speaks explicitly to the issue of whether a loss in overtime compensation qualifies as a loss of wage earning capacity. Moreover, a recent Commission "trend" in deciding an issue, following a "trend" in the opposite direction, does not provide a "long-standing construction given a statute by an agency charged with administering it." *Stachowski,* 402 Md. at 517, 937 A.2d at 201.

**3.** Section 14.09.01.07(A) of the Code of Maryland Regulations (COMAR) explicitly includes overtime in the calculation of an employee's average

The direct legislative history of the Act is similarly sparse. For nearly a century, the language of L.E. § 9–615(a) has been resistant to substantive revision. Originally enacted as part of the Workers' Compensation Act of 1914, the temporary partial disability compensation law consistently has provided for compensation when post-disability "wage-earning capacity ... in the same employment or otherwise" is "less" than pre-disability wage earning capacity. Workers' Compensation Act, 1914 Md. Laws, ch. 800, § 35(4). *See* Md.Code (1957, 1985 Repl.Vol.) Art. 101, § 36(5) ("In case of a temporary partial disability, an injured employee shall receive fifty per centum of the difference between his average weekly wages and his wage-earning capacity thereafter in the same employment or otherwise if less than before the accident."); *see also* 1991 Md. Laws, ch. 8 § 2 (Revisor's Note of 9–615) ("[The current statutory language] is new language derived without substantive change from the first sentences of former Art. 101, § 36(5).").

Our caselaw likewise provides little guidance in divining the meaning of "wage earning capacity." We have recognized that "[t]he Act recognizes four categories of disability: (1) temporary partial disability, § 9–614; (2) temporary total disability, § 9–618; (3) permanent partial disability, § 9–625; and (4) permanent total disability, § 9–635." *Buckler v. Willett Constr. Co.*, 345 Md. 350, 354, 692 A.2d 449, 451 (1997). The cases, however, have dealt primarily with the latter three categories. We have "interpreted 'disability' to mean 'earning capacity[,]' " only in the context of temporary *total* disability. *Victor v. Proctor & Gamble Mfg. Co.*, 318 Md. 624, 632, 569 A.2d 697, 701 (1990). That is to say, "[t]otal disability is synonymous with the inability to work[,]" *Buckler*, 345 Md. at 358, 692 A.2d at 453 (emphasis added), and the inability to work means earning capacity is "nil," *Victor*, 318 Md. at 633, 569 A.2d at 702. Therefore, when an employee loses all wage earning capacity, the employee may be found temporarily

weekly wage. However, average weekly wage is a distinct statutory term, not at issue in this case.

totally disabled under the Act. *Buckler,* 345 Md. at 359–60, 692 A.2d at 453. However, this binary definition of wage earning capacity—either it is maintained or it is totally lost—does not help us parse the varying degrees of diminution in pay that an employee may experience due to a partial disability. *Buckler* thus does not inform the question of whether a loss of overtime compensation qualifies as a diminishment of wage earning capacity.

We must, then, interpret Title 9 of the Labor and Employment Article language without the assistance of the traditionally-used interpretive aids. We recently faced a similar situation in *Stachowski v. Sysco Food Serv. of Baltimore, Inc.,* 402 Md. 506, 937 A.2d 195 (2007). In *Stachowski,* we interpreted the Workers' Compensation Act to determine whether "payment" in L.E. § 9–736(b) occurred when a disability check was mailed or when it was received. 402 Md. at 511–12, 937 A.2d at 198. In that case, the claimant, Stachowski, received worker's compensation payments from his employer's insurer after sustaining a temporary disability and filing a timely claim with the Commission. *Id.* at 510, 937 A.2d at 197. He received his last disability compensation check on October 22, 1998, although the check was mailed on October 21, 1998. Stachowski filed for a modification of his original compensation award exactly five years later, on October 22, 2003. *Id.,* 937 A.2d at 197. The Commission found, and the Circuit Court and Court of Special Appeals later affirmed, that the Act's statute of limitations provision, L.E. § 9–736(b)(3)(iii), barred modifications of a compensation award "[five] years . . . from the date the last compensation check was mailed." *Id.* at 511, 937 A.2d at 197. The Commission, the Circuit Court, and the Court of Special Appeals all held that "payment," for purposes of "last compensation payment," occurred when the disability checks were mailed. Consequently, Stachowski's claim was one day outside the permissible statutory window. *Id.,* 937 A.2d at 197–98.

We issued a writ of certiorari, and held that the date of payment, for L.E. § 9–736(b) purposes, was the date payment was received, not the date payment was mailed. *Id.* at 531,

937 A.2d at 209. In so holding, we noted that "[last compensation payment] does not appear elsewhere in the Maryland Code, and the term 'payment' is not defined within the Act." *Id.* at 518, 937 A.2d at 201. We further noted that "[o]ur search has uncovered no legislative history concerning [the phrase's] intended meaning." *Id.*, 937 A.2d at 201. In order to interpret the phrase, we "look[ed] first at the dictionary definition of the word 'payment' for insight as to legislative intent." *Id.* at 525, 937 A.2d at 206. We then found that the dictionary definition was "in accord" with other uses of the term elsewhere in the Maryland Code-namely, the Maryland Uniform Commercial Code codified in Title 3 of the Commercial Law Article. *Id.* at 526, 937 A.2d at 206. We concluded that "the common understanding of payment and other references to the term in the Code [were] sufficient support to determine the outcome of [the] case," before confirming that our holding was consistent with analogous federal and state law. *Id.* at 528, 937 A.2d at 207.

We shall use a similar analysis here, and we now turn to that task.

## III.

We begin by determining the commonly understood meaning of wage earning capacity. The County urges that wage earning capacity must be interpreted to exclude overtime wages. The County cites two editions of Black's Law Dictionary for the assertion that "earning capacity" (not "*wage* earning capacity") connotes a measure of the ability to work. *See Black's Law Dictionary* 430 (8th ed. 2005) (defining earning capacity as "[a] person's ability or power to earn money, given the person's talent, skills, training, and experience."); *Black's Law Dictionary* 456 (5th ed. 1979) (defining earning capacity as "capability of worker to sell his labor or services in any market reasonably accessible to him. . . . Term does not necessarily mean the actual earnings that one who suffers an injury was making at the time the injuries were sustained"). Using those definitions, the County argues that the ability to earn overtime is separate from the ability to

work. In the County's view, overtime is not a reflection of an employee's ability to perform the tasks of a job; instead, it is the product of the employer's need. Thus, according to the County, Appellee's ability to work—his earning capacity—did not decrease when his overtime compensation decreased; rather, his ability to perform work in order to earn his pre-disability base pay remained constant. And, urges the County, it ensured that Appellee's earning capacity was not "less" during the period of temporary partial disability, by artificially raising Appellee's pay rate to make up for his reduction in regular-work hours.[4]

The County's reliance on a dictionary definition "provide[s] a useful starting point for determining what [the] statutory terms mean[.]" *Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 447, 697 A.2d 455, 460 (1997). Although "dictionary definitions do not provide dispositive resolutions of the meaning of statutory terms[,]" *id.*, 697 A.2d at 460, "it is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning," *Chow v. State*, 393 Md. 431, 445, 903 A.2d 388, 396 (2006). Specifically, the County provides a fair interpretation for "earning capacity"—the abstract capability of an employee to earn money by selling his or her labor or services.

Still, the County's interpretation is incomplete. Its sheds light on the meaning of "earning capacity," but L.E. § 9–615 does not hinge temporary partial disability compensation on earning capacity alone. The law provides for compensation when "the *wage earning capacity* of a covered employee is less." L.E. § 9–615(a)(1) (emphasis added). Put another way, L.E. § 9–615 is concerned with whether a disabled employee has lost any part of the employee's pre-disability capacity to earn a wage.

---

**4.** In connection with the County's "earning capacity" argument, both the County and Appellee discuss whether the actual wages of an employee are relevant, or dispositive, evidence in a determination of that employee's wage earning capacity. Although this evidentiary issue received much attention in the parties' briefs and at oral argument, we need not address it in order to interpret L.E. § 9–615(a)'s language.

The question, then, is whether overtime compensation can fairly be characterized as a wage. *See Buckler,* 345 Md. at 355, 692 A.2d at 451 ("The formula for temporary partial disability ... accounts for *wages* earned by the employee while disabled." (emphasis added)). If so, the inability to earn overtime would be a loss of capacity to earn a wage, or a diminishment of wage earning capacity. Black's Law Dictionary defines "wage" as follows: [5]

> Payment for labor or services, usu[ally] based on time worked or quantity produced; specif[ically], compensation of an employee based on time worked or output of production. *Wages include every form of remuneration payable for a given period to an individual for personal services,* including salaries, commissions, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer.

*Black's Law Dictionary* 1610 (8th ed. 2004) (emphasis added). Self-evidently, overtime compensation falls within this definition. Overtime pay is a form of remuneration for an employee's personal service, that is, compensation based on labor performed and time worked. Moreover, wage is a broad term, including "every form of remuneration payable for a given period." *Id.*

---

**5.** Our decision to use a recent edition of a legal dictionary is not an arbitrary one. We have noted in the past that in this mode of statutory interpretation,

> [b]ecause we are attempting to ascertain the intent of the Legislature in choosing certain language at a point in time, resort to a dictionary, legal or otherwise, should logically include consultation of those editions (in addition to current editions) of dictionaries that were extant at the time of the pertinent legislative enactments.

*Harvey v. Marshall,* 389 Md. 243, 260 n. 11, 884 A.2d 1171, 1181 n. 11 (2005). Therefore, our investigation into the word "wage" includes reference to dictionaries with definitional information from 1914 and 1991, the two points in time at which L.E. § 9–615 was written and recodified. The definitions from these dictionaries are strikingly similar to the contemporary definition. We, therefore, shall rely on the contemporary definition of the "wage," as it is a fair representation of wage's common usage "extant at the time of the pertinent legislative enactments." *Id.,* 884 A.2d at 1181 n. 11.

Consistent with the broad dictionary definition of "wage," the use of that word in the phrase "wage earning capacity," strongly suggests that the legislature intended "wage" to include overtime compensation. It then would follow that, when an employee is restricted by disability from performing overtime labor, and thus from earning overtime compensation, the employee is restricted from earning a wage. The employee's wage earning capacity would be "less," for purposes of L.E. § 9–615(a)(1), as the result of the disability.

 Even though the dictionary definition suggests the correct construction of "wage earning capacity," we are cognizant that, "[w]hile the dictionary may be a starting point to ascertaining the Legislature's intent, it is not necessarily the end." *Schreyer v. Chaplain*, 416 Md. 94, 101, 5 A.3d 1054, 1058 (2010) (internal quotation marks omitted). Therefore we shall seek corroboration of our understanding of the common definition (if it is to be found at all), by examining other instances in the Maryland Code when the Legislature has defined "wage." We undertook a similar examination in *Stachowski*. We looked across the Maryland Code from the Labor and Employment Article to the Commercial Law Article to confirm that the "definition of payment [was] in accord with the principles of commercial law in the Maryland Uniform Commercial Code." 402 Md. at 526, 937 A.2d at 206.

Here, we need not search outside the Labor and Employment Article. Within the Article itself we find multiple subtitles that consistently confirm our interpretation.

The definition of "wage" is found in five subtitles in the Labor and Employment Article. Every subtitle, using identical language, defines wage broadly and inclusively. L.E. § 3–301(c)(1), defining wage for the purpose of State's equal pay statute, mandates that wage "means *all compensation* for employment" (emphasis added); and L.E. § 3–401(d), defining wage for the State wages and hours laws, explains that wage "means *all compensation* that is due to an employee for employment" (emphasis added). In addition, L.E. § 3–501(c)(1), defining wage for the wage payment and collection

laws, explains that wage "means *all compensation* that is due to an employee for employment" (emphasis added); and in the same section, includes within the definition of wage "a bonus;" "a commission;" "a fringe benefit;" and "any other remuneration promised for service."[6] L.E. § 3–501(c)(2)(i–v). Likewise, L.E. § 8–101(z)(1), defining wage for the State unemployment insurance laws, states that wage "means *all compensation* for personal services...." (Emphasis added). L.E. § 8–101(z)(2) & (3) specifically include bonuses, commissions, tips, and the cash value of all compensation received in a medium other than cash within the definition, and exclude certain payments made to an employee on behalf of a health or medical plan. Finally, L.E. § 10–101(g)(1), defining wage for the State Injured Workers' Insurance Fund, states that wage "means *all earnings* that are due to an employee for employment" (emphasis added); L.E. § 10–101(g)(2) then plainly states that "wage" includes overtime pay.

Each statutory definition contains the same operative language. "Wage" does not denote a specific type of compensation, or a specific mode of compensation. Just the opposite, "wage" denotes *all* the types of compensation that an employee could receive for employment, including that which is tied strictly to an employee's ability to perform a job, like a tip or gratuity, and that which hinges, in part at least, on variables

---

**6.** L.E. § 3–501(c)(2)(iv) adds "overtime wages" within the definition of wages. But, we leave it out of our analysis here because that provision was added by amendment to the subtitle in October 2010. The law at the time Appellee's claim was adjudicated, June 2009, did not contain the overtime wages language.

 We note, though, that "overtime wages" was added as a fourth example of "wage" in L.E. § 3–501(c)(2), by Senate Bill No. 694 during the 2010 Regular Session of the Maryland General Assembly. The Bill itself explains that the overtime wages language was added to "clarify[ ] that the definition of 'wage'... includes overtime wages." S.B. 694, 2010 Gen. Assemb., 427th Sess. (Md.2010); 2010 Md. Laws, ch. 99. Additionally, the Fiscal Note attached to Senate Bill No. 694 reveals that the Maryland State Department of Labor, Licensing, and Regulation already considered overtime wages as falling within the statutory definition, even without the explicit language. Dep't of Leg. Serv., Fiscal and Policy Note of S.B. 694, Gen. Assembly 2010–694, 427th Sess. at 1 (Md.2010).

that might well be independent of employee performance, like bonuses and commissions. Similar to overtime compensation, a bonus is not strictly predicated on an employee's ability to perform meritoriously, but is based on the financial ability of the employer to pay out compensation beyond regular salary.

We determine, from our examination of the various instances in which the General Assembly has employed the word "wage," that its meaning is uniform and confirms our understanding of the commonly held, dictionary definition of "wage." That is to say, "wage" includes a wide range of employment remunerations, including overtime compensation. We therefore conclude that the General Assembly intended "wage," in the phrase "wage earning capacity," to carry the same broad meaning the legislature has given the same word in the rest of the Labor and Employment Article. That meaning, moreover, comports with the common understanding of the word. Indeed, given the multiple uniform definitions of "wage" throughout the Labor and Employment Article, to read "wage" narrowly to exclude overtime compensation (as the County would have us do) would produce a "farfetched, absurd, or illogical result[ ] which would not likely have been intended by the enacting body." [7] *Kilmon v. State*, 394 Md. 168, 177, 905 A.2d, 306, 311 (2006).

Our interpretive task is often completed by looking to the legislative history of the Act, and ensuring that our interpretation is consistent with the Act's statutory purpose. *See, e.g., Breslin v. Powell*, 421 Md. 266, 287, 26 A.3d 878, 891 (2011) ("If the sense of the statute is either unclear or ambiguous . . . courts will look for other clues—e.g., the construction of the statute, the relation of the statute to other laws in a legislative scheme, the legislative history, and the general purpose and intent of the statute."); *Breitenbach*, 366 Md. at 473, 784 A.2d at 572 ("[W]hen the meaning of the [the Act] is ambiguous or

---

7. The Labor and Employment Article was recodified in its entirety via a single, all-encompassing bill, HB 1, during the 1991 legislative session. We can safely presume that the Legislature, in the recodification process, was aware that it was re-using a term in L.E. § 9–615 that it had uniformly defined in multiple other places in the same bill.

unclear, we seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based."). We shall do so in this case.

Since its passage into law almost a century ago, the Act's preamble has guided us in interpreting its provisions. *Wal Mart,* 416 Md. at 361–62, 7 A.3d at 22; *Victor,* 318 Md. at 628, 569 A.2d at 699; *Lowery v. McCormick Asbestos Co.,* 300 Md. 28, 40–41, 475 A.2d 1168, 1174–75 (1984); *Victory Sparkler & Specialty Co. v. Francks,* 147 Md. 368, 373, 128 A. 635, 636 (1925); *Solvuca v. Ryan & Reilly Co.,* 131 Md. 265, 267–68, 101 A. 710, 711 (1917). Based on the preamble, we have pinpointed a number of purposes for the Act, including the protection of workers from hardships inflicted by work-related injury, *Victor,* 318 Md. at 628, 569 A.2d at 699, and the equitable distribution of the burden of workplace accidents among the employer, employee and taxpayers, *Wal Mart,* 416 Md. at 362, 7 A.3d at 22. The County draws on the latter purpose to argue that overtime should not be included in the calculation of wage earning capacity. The County again points out that overtime depends on the need for services rather than an employee's ability to work. The County's argument proceeds, essentially as follows: First, if the need for overtime does not exist, then overtime compensation is not paid out; further, by including past overtime in the determination of an employee's current wage earning capacity, an employee would be compensated for work that does not exist at the time of the disability, creating a windfall for the employee and unfairly burdening the employer (and its insurer) in the process.

The County's windfall argument conflates separate aspects of subsection (1) of L.E. § 9–615(a). The County's argument assumes that the Commission will affix the payment amount by comparing how much "less" post-disability wage earning capacity is from pre-disability wage earning capacity. Under such a one-step analysis, employees would certainly enjoy a windfall. Hypothetically, an employee who works an inordi-

nate amount of overtime three weeks prior to a disability would inflate artificially his pre-disability wage earning capacity. In turn, post-disability wage earning capacity would seem that much "less" in comparison, and the employee would be artificially compensated as if the employee consistently worked that amount of overtime.

The County's argument ignores the second of the two aspects of L.E. § 9–615(a). Disability payments are based on the difference between average weekly wage and wage earning capacity, not pre- and post-disability wage earning capacity. The statutory calculation directly responds to the County's concern by dampening the effect of any inordinate spike in overtime hours worked. The average weekly wage calculation entails a fairly deep accounting of the employment history of the employee, averaging the amount of time worked over 14 weeks. COMAR 14.09.01.07(A). *See supra* note 3. The extra overtime worked during the three weeks before the injury would be diluted by the absence of overtime worked during the prior 11 weeks. Thus, even if an employee can show, by using the spike in overtime, that his or her wage earning capacity is "less" during the period of temporary partial disability, the compensation calculation ensures that the employee enjoys no windfall, but is fairly compensated for the amount of wages earned on a more regular basis. An equitable distribution of the burden of workplace accidents is maintained.

Furthermore, our interpretation conforms to the statute's purpose of protecting workers from hardships. *Victor,* 318 Md. at 628, 569 A.2d at 699. Appellee's case provides the example of how this is so. He testified that he worked 800–1000 hours of overtime in a calendar year. In the 14 weeks leading up to each of Appellee's injuries, he worked an average of 11.9 and 15.4 overtime hours, respectively. After his injuries, Appellee's overtime compensation dipped to one overtime hour per week, costing him, by our calculation, $760 and $761 dollars per week, respectively. In total, the 42 weeks

Appellee spent on "light duty," cost him roughly $32,240.[8] The numbers show that Appellee's occupation, firefighting, called for him to work a steady stream of overtime hours, and missing those hours proved to be a $30,000 hardship.[9]

In summary, we hold that "wage," as that term is used in the phrase "wage earning capacity" in L.E. § 9–615(a), includes compensation paid for overtime hours worked prior to temporary partial disability. Accordingly, we agree with the Circuit Court that the Commission correctly determined that Appellee's wage earning capacity was "less," under L.E. § 9–615(a), entitling him to compensation payment in accordance with the calculation scheme set forth in that section.

**JUDGMENT OF THE CIRCUIT COURT OF MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY MONTGOMERY COUNTY.**

---

**8.** The County offered no evidence before the Commission, or even at the summary judgment stage in Circuit Court, that overtime would have been generally unavailable to Appellee had he been healthy during the 42 weeks of his "light duty." We can only infer that, if not for the disability, Appellee would have worked an amount consistent with his established pattern of overtime.

**9.** Appellee's case is not isolated. Appellee is one of the 55% of workers in the modern American workforce employed in jobs that receive overtime pay, according to the United States Department of Labor's Bureau of Labor Statistics. John L. Bishow, U.S. Bureau of Labor Statistics, *A Look at Supplemental Pay: Overtime Pay, Bonuses, and Shift Differentials*, ¶ 5 (Posted March 25, 2009). According to this report, overtime, generally, represents 2.7% of the cash compensation those workers receive for their job. *Id.* at ¶ 10. When those workers lose overtime compensation, they lose one of the few benefits they receive as a direct cash payment. *Id.* at ¶ 3.