**HEADNOTE:** *Richard Beavers Construction, Inc., et al. v. Dexter Wagstaff*, No. 1977, Sept. Term, 2016. Opinion by Arthur, J.

**WORKERS' COMPENSATION—AVERAGE WEEKLY WAGE**

Neither statute nor regulation nor case law strictly requires the Workers' Compensation Commission to calculate the average weekly wage of a covered employee using an average of the actual earnings before an accidental injury. For some newly-hired employees, the actual earnings before the injury may not accurately represent what the employee normally would earn from the employer. The Workers' Compensation Commission is not required to calculate average weekly wage using the actual earnings from the period before an accident where: (1) the employer hired the employee for the stated purpose of working "full time," meaning 40 hours per week; (2) the employee suffered a disabling injury only a short period of time after being hired; (3) the employee worked substantially less than 40 hours per week during that period; and (4) other circumstances call into question whether the actual hours worked during that period accurately represented the employee's normal working hours.

In this case, the Commission determined an employee's average weekly wage based on the 40-hour work week for which he had been hired, instead of using the actual hours during the six weeks he worked prior to the accident, which were shortened by inclement weather. Given that the parties presented only those two, imperfect options, the Commission's determination was not incorrect as a matter of law. Under the circumstances, it was not unreasonable to conclude that multiplying the hourly rate by 40 hours would result in the better approximation of what the employee normally would earn from the employer under the contract that was in existence at the time of the injury.

Circuit Court for Talbot County
Case No. 20-C-14-008769

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1977

September Term, 2016

_____

RICHARD BEAVERS CONSTRUCTION,
INC., *et al.*

v.

DEXTER WAGSTAFF

_____

Meredith,
Berger,
Arthur,

JJ.*

_____

Opinion by Arthur, J.

_____

Filed:  March 1, 2018

* Judge Christopher B. Kehoe did not
participate in the Court's decision to designate
this opinion for publication pursuant to Md.
Rule 8-605.1

Under the Maryland Workers' Compensation Act, employees who suffer disabling injuries in work-related accidents receive compensation to help offset their lost earning capacity. The amount of compensation is determined as a percentage of the employee's "average weekly wage" at the time of the accident.

This appeal concerns the proper determination of the average weekly wage for an employee who became disabled in a workplace accident just six weeks after he was hired to work full time at a construction company. As a result of inclement weather, he had worked substantially less than 40 hours per week in the six weeks before the accident. During that time, he received payment only for hours when he actually worked.

The parties presented the Workers' Compensation Commission with only two options for determining the employee's average weekly wage. The employee contended that his average weekly wage should be based on the 40-hour work week for which he had been hired; the employer and its insurer contended that the average weekly wage should be no higher than the average of the actual earnings from the six weeks before the accident. After a hearing, the Commission agreed with the employee and awarded him compensation based on wages from a 40-hour work week.

The employer and insurer sought judicial review, and the Circuit Court for Talbot County confirmed the Commission's decision. The employer and insurer have appealed to this Court. Because they have not shown that the Commission's decision is premised on an error of law, we affirm the judgment confirming the decision.

## FACTUAL AND PROCEDURAL BACKGROUND

The factual record for this case consists of testimony and documents offered to the

Workers' Compensation Commission and some additional materials submitted to the circuit court in the judicial review proceeding. Neither the veracity of the testimony nor the accuracy of the documents are in question.

In the circuit court, the parties purported to "agree" that there was no dispute as to the underlying facts, but they did not prepare any formal stipulation to clarify their agreement. Although the parties continue to assert that there are no factual disputes, they have not given this Court an agreed statement of facts. Their respective briefs present competing factual summaries, each emphasizing certain facts at the expense of others. In fairness to all parties, this opinion will begin by examining all facts identified by the parties (including those facts that one side or the other may have declined to discuss).

### A.     <u>Mr. Wagstaff's Employment with Richard Beavers Construction, Inc.</u>

The employee in this case, Dexter Wagstaff, began working as a lift operator for Richard Beavers Construction, Inc. (RBCI), on or around February 15, 2013. RBCI agreed to pay Mr. Wagstaff at a rate of $18.95 per hour. According to Mr. Wagstaff, RBCI hired him to work "full time," meaning "40 hours a week[.]" Although he needed to be available to work eight hours a day for five days a week, his supervisors instructed him not to report to the construction site on days when it was raining or snowing. He did not receive payment for hours or days when he could not work because of poor weather.

Mr. Wagstaff often worked full, eight-hour days during his first six weeks of employment, but frequent rain and occasional snow prevented him from working full, 40-hour weeks. RCBI's records show that, during that six-week period, he worked an average of only 16.75 hours per week, for which he received average gross earnings of

2

$317.41 per week.[1]  His highest totals occurred in his sixth week of employment, when he worked three full days (24 hours) and earned gross wages of $454.80.  Poor weather was the only reason that he ever missed a day of work with RBCI.

## B.     The Accidental Personal Injury and Resulting Disability

On the morning of April 1, 2013, Mr. Wagstaff suffered an accidental injury at the construction site when he fell through the roof and landed face-first on the warehouse floor, 18 feet below.

The following summary of his injuries was later presented to the Commission:

> He was knocked unconscious.  He sustained multiple facial injuries, which included a fractured skull, two fractured cheekbones, a fractured right eye orbital, multiple chipped teeth with his front tooth knocked out, fractured nasal bone.  In addition, he injured his neck, his thoracic spine, his left shoulder, his back, and his left knee.

An ambulance transported Mr. Wagstaff to Peninsula Regional Hospital, where he underwent an array of tests.  Because of the severity of his injuries, he was airlifted by helicopter to the University of Maryland's Shock Trauma Center.  There, a surgical team "performed an eight-hour surgery to Mr. Wagstaff's right eye socket and placed titanium plates and screws in his right and left cheeks."

Upon his discharge, Mr. Wagstaff continued to suffer from his injuries.  He soon returned to the emergency room, and he was hospitalized for another three days for

---

[1] Some of RCBI's documents are difficult to read because they have poor image quality and small type size.  Perhaps for that reason, RBCI has at different times claimed that Mr. Wagstaff's average earnings were either $317.38 or $317.44.  As best as we can decipher, the actual figure appears to be $317.41, which results from total earnings of $1,904.48, from working 100.5 hours at $18.95 per hour.

various symptoms, including: headaches, dizziness, vertigo, loss of consciousness, double-vision, irritability, insomnia, short-term memory loss, and other effects of post-concussion syndrome. For over a year after the accident, he underwent frequent occupational therapy to help him cope with the neurological effects of his injury, as well as the continuing pain in his neck and shoulder.

Although the accident occurred on April 1, 2013, RBCI paid Mr. Wagstaff $758.00 for a full 40 hours for the week that ended on April 3, 2013. For a short time thereafter, RBCI continued to send him paychecks in the amount of $758.00.

### C. Proceedings before the Workers' Compensation Commission

Three weeks after the accident, on April 22, 2013, Mr. Wagstaff submitted a claim with the Workers' Compensation Commission. On the claim form, he reported his "Gross Weekly Wages" as $758.00, the amount that he would earn from working 40 hours at the rate of $18.95 per hour.

In response, RBCI submitted its payment records. RBCI claimed that Mr. Wagstaff had actually earned an average of $317.38 per week during the six weeks before the accident.

On May 31, 2013, the Commission issued an order stating that Mr. Wagstaff had sustained an injury arising out of and in the course of his employment and that he was temporarily totally disabled as a result. The Commission ordered RBCI and its insurer, Selective Way Insurance Company, to pay for Mr. Wagstaff's medical treatment. Based on the information that had been submitted at the time, the Commission determined that Mr. Wagstaff's average weekly wage was $317.38 as of the date of the accident. Using

4

the statutory formula for compensation based on temporary total disability (*see* Md. Code (1991, 2016 Repl. Vol.), § 9-621 of the Labor and Employment Article ("LE")), the Commission ordered RBCI and Selective Way to pay Mr. Wagstaff two-thirds of that figure, which the Commission rounded up to $212.00 per week. The order expressly reserved "the right of both parties to have the issue of average weekly wage [a]djudicated at the first hearing before the Commission."

On April 16, 2014, the Commission held a hearing to address the issue of Mr. Wagstaff's average weekly wage, as well as his various requests to authorize continuing medical treatment. In introductory remarks, RBCI and its insurer asserted that the average weekly wage was "$317.44 per the wage statement." Through counsel, Mr. Wagstaff announced that he was "contesting" that issue and that his average weekly wage should be $758.00, based "on the 40-hour week at $18.95 an hour[.]" The Commission informed the parties that it would "have to take testimony on that [issue]" and "determine the wage based on the evidence presented" at the hearing.

On the wage issue, Mr. Wagstaff gave the following testimony:

Q:      . . . [W]ere you hired full time or part time by Mr. Beavers?

A:      Full time.

Q:      All right. Is that 40 hours a week?

A:      Yes.

*      *      *

Q:      Sir, were you working full weeks when you were hired? Did you work a 40-hour week?

5

A:     Yes, if it didn't rain.

Q:     All right. Now, if it rained, what happened?

A:     We don't work.

Q:     Would you be at work though? Would you go to work?

A:     No, we was told not to.

Q:     Were you called by the employer to not work?

A:     No, we just know not to go when it rain.

Q:     All right. Other than for bad weather, were there any other reason that you wouldn't go to work?

A:     No.

Q:     So it was just for bad weather during that time.

A:     Yes, because we was outside on the roof.

Q:     All right. And I assume, sir, based on the pay stubs . . . that the employer and insurer showed us, there were a lot of weeks where you didn't work 40 hours. Was that all because of weather?

A:     Yes.

The only other witness on the wage issue was Mr. Richard Beavers, the owner of RBCI. Mr. Beavers assured the Commission that the records of Mr. Wagstaff's hours were accurate because he had been hired for "a government project" for which the payroll needed to be "certified every week" by RBCI's bookkeeper. Although he admitted that he did not personally hire Mr. Wagstaff, Mr. Beavers recalled that he did not "promise" that Mr. Wagstaff could work "any exact number of hours[.]" Mr. Beavers testified that he indicated to Mr. Wagstaff "that he could work when work was available[.]" When asked whether he was "aware that [Mr. Wagstaff] was hired on a full-time basis," Mr.

6

Beavers answered: "I would assume so."

Mr. Beavers also testified that, in the week of the accident, he paid what he called "a full check" to Mr. Wagstaff in the amount of $758.00, "based on a 40-hour week." Mr. Beavers explained that, "at some point" after the accident, RBCI "made the transition from paying him [for] 40 hours to paying him only a 500-dollar check," which RBCI then continued to do for several months. During cross-examination, Mr. Beavers admitted that he decided to make the supplemental payments of $500 per week because he knew that Mr. Wagstaff was receiving compensation based on "a far lower figure" than the $758.00 that Mr. Wagstaff "would have made assuming he was working five days a week full time."

After taking evidence, the Commission declined to hear arguments on the average weekly wage issue. On the same day as the hearing, the Commission issued an order stating that Mr. Wagstaff's "true average weekly wage is $758.00" and ordering that "the temporary total disability rate shall be adjusted accordingly[.]" Under the statutory formula, therefore, Mr. Wagstaff was entitled to receive $505.33 per week during the period when he was temporarily totally disabled. *See* LE § 9-621. The order further stated that RBCI and its insurer were entitled to a credit for the gratuitous payments that RBCI had made to Mr. Wagstaff after the injury.

### D.    <u>Judicial Review in the Circuit Court</u>

RBCI and Selective Way filed a timely petition in the Circuit Court for Talbot County, seeking review of the Commission's decision.

During discovery, Mr. Wagstaff gave deposition testimony that was consistent

7

with, but more detailed than, his testimony to the Commission. He reiterated that RBCI had hired him "to work full time." He recalled that, although he did not sign an employment contract, he filled out an application form on his first day with the understanding that he "was applying for a full-time job." He explained that his position required him to be ready to work every weekday from 6:00 am until around 3:00 pm.[2] He admitted that, at the time he was hired, he understood that he would not receive pay when he could not work because of weather. He further admitted that this arrangement was "typical in the position of a field operator . . . working outdoors[.]"

Mr. Wagstaff recalled that, soon after he started working for RBCI, rain and snow prevented him from working full 40-hour weeks. On some mornings, he would receive instructions not to report for work. If it rained unexpectedly after the crew arrived, he would receive pay for "two hours just for being there." He maintained, as he did in his testimony to the Commission, that bad weather was the only reason that he ever missed a day or partial day of work.[3]

Based on this deposition testimony and the record of the proceedings before the Commission, RBCI and its insurer moved for summary judgment. They contended that the calculation of Mr. Wagstaff's average weekly wage depended entirely on a question of law. They argued that his average weekly wage "should be calculated based on the

---

[2] Evidently, this nine-hour schedule included an unpaid lunch hour.

[3] Mr. Wagstaff worked only eight hours during his first, one-week pay period. His testimony was somewhat unclear about the exact date of hiring. Although he believed that he had been hired on February 15, a Friday, he also believed that he had been hired on the final day of his first pay period, which ended on Wednesday, February 20.

actual hours worked by [him] when work was available[,]" and that the days he missed because of "inclement weather should be considered as part of the wage calculation as a matter of law[.]" On that basis, they contended that the "correct" average weekly wage was $317.44.

In response, Mr. Wagstaff argued that the $317.44 figure did not "represent a fair and accurate measure of his earnings" because it was based on "a limited number of weather shortened weeks[.]" In purported reliance on LE § 9-602(a)(3), he also argued that the statute permitted the Commission to account for the likelihood that his wages "could be expected to increase under normal circumstances[.]" The circuit court denied the summary judgment motion in a simple order, without announcing its reasons.

Shortly before the scheduled trial date, RBCI and its insurer withdrew their jury trial request. All parties filed a joint motion, stating that they "agree[d] that there [was] no genuine dispute of material fact" and that they "intend[ed] to proceed with oral arguments addressing the legal issue" in the Commission's order. Soon thereafter, RBCI and its insurer submitted a memorandum of law, which essentially reiterated the arguments that they had advanced in support of their summary judgment motion.[4]

The circuit court heard oral arguments on October 19, 2016. A few weeks later, on November 2, 2016, the circuit court issued an order confirming the Commission's decision. In a written opinion, the court stated that the parties had presented the sole

---

[4] The transcript indicates that Mr. Wagstaff also submitted a memorandum of law to the circuit court during the hearing. That document does not appear in the record on the court's electronic filing system.

legal issue of whether the average weekly wage should be "based on the average of the wages that Mr. Wagstaff actually received" or whether it could be based on "what RBCI had agreed to pay him." The court concluded: "He had been promised $758.00 per week, and it is reasonable to conclude that this figure represents an expected increase in salary and, therefore, the Court finds that $758.00 is Mr. Wagstaff's average weekly wage."

After the entry of judgment, RBCI and Selective Way noted this timely appeal.

### DISCUSSION

In this appeal, the employer (RBCI) and its insurer (Selective Way) raise the single issue of whether the Workers' Compensation Commission erred when it determined that Mr. Wagstaff's average weekly wage was $758.00.[5] RBCI and its insurer contend that the Commission's decision, as well as the circuit court judgment confirming it, are "incorrect as a matter of law." They argue that the Commission was required to calculate average weekly wage by adding up gross earnings from the six weeks before the accident and then dividing that total by six. On that basis, they seek reversal of the Commission's decision and an order finding that the "correct" average weekly wage is $317.44.

Because the appellants have challenged a decision of the Commission, our analysis begins with the standard set forth in the Workers' Compensation Act. In a case involving accidental personal injury, the court's task is to "determine whether the

---

[5] The appellants framed the issue in this way: "Whether the Appellee's average weekly wage for determination of workers' compensation benefits should be calculated based upon the Appellee's actual wages earned during the period worked prior to the accidental injury as opposed to hypothetical and speculative future wages and hours."

10

Commission: (1) justly considered all of the facts about the accidental personal injury . . . ; (2) exceeded the powers granted to it . . . ; or (3) misconstrued the law and facts applicable in the case decided." LE § 9-745(c). The court must confirm the decision unless it determines that the Commission exceeded its authority or misconstrued the law or facts. *Uninsured Empl'rs' Fund v. Pennel*, 133 Md. App. 279, 288-89 (2000).

A decision of the Commission "is presumed to be prima facie correct," and "the party challenging the decision has the burden of proof." LE § 9-745(b)(1)-(2). This presumption of correctness, however, does not extend to legal determinations, which are subject to independent review by the courts. *Montgomery County v. Deibler*, 423 Md. 54, 60 (2011). The courts are "under no constraint" to uphold a decision if it is "premised solely upon an erroneous conclusion of law." *Pro-Football, Inc. v. McCants*, 428 Md. 270, 283 (2012) (citation and quotation marks omitted).

RBCI and its insurer assert that "this matter presents a question concerning the method of calculating average weekly wage," which should be reviewed without any deference. Mr. Wagstaff agrees that the central issue in this case is one of law. Likewise, the circuit court expressly treated the issue as a purely legal one.

In general, where the parties to a judicial review proceeding "agree on the facts, leaving the interpretation of [a statute] as the sole legal issue[,]" the appropriate standard of review is de novo. *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 376 (2013). In cases where parties have presented competing methods for determining an employee's average weekly wage, the Court of Appeals has stated that "the issue essentially is a question of law" (*Long v. Injured Workers' Ins. Fund*, 448 Md. 253, 265

11

(2016)), and that "treating the issue . . . as one of law is consistent with th[e] Court's prior opinions." *Gross v. Sessinghause & Ostergaard, Inc.*, 331 Md. 37, 48 (1993).

According to RBCI and its insurer, this case turns on a matter of statutory and regulatory interpretation. They contend that, as a matter of law, an employee's average weekly wage "should be calculated using the wages actually earned during the period worked prior to the accidental injury." They argue that this conclusion follows from a "plain reading" of two provisions: LE § 9-602(a)(1), which governs the general computation of average weekly wage; and COMAR 14.09.03.06, which sets forth the procedure for the Commission to determine average weekly wage.

When we are called upon to interpret any statute, we first examine the ordinary meaning of the enacted language, reading the statute as a whole to avoid an interpretation that might nullify another part of the statute. *Reger v. Washington Cnty. Bd. of Educ.*, 455 Md. 68, 96 (2017). If the statutory language is sufficiently clear, the interpreter normally will have no need to look beyond the statute itself. *Id.* These basic principles of construction guide the interpretation of regulations as well as statutes. *Hranicka v. Chesapeake Surgical, Ltd.*, 443 Md. 289, 298 (2015).

"When interpreting the Workers' Compensation Act, 'additional principles of interpretation enter the equation.'" *Hollingsworth v. Severstal Sparrows Point, LLC*, 448 Md. 648, 655 (2016) (quoting *Montgomery County v. Deibler*, 423 Md. at 61). The Act expressly states that it should not be "strictly construed" (LE § 9-102(b)), but instead that it should be "construed to carry out its general purpose." LE § 9-102(a). The purpose, as stated in the preamble to the original version of the Act, "was to equitably distribute the

burden of workplace accidents among the State, taxpayers, employees, and employers." *Wal Mart Stores, Inc. v. Holmes*, 416 Md. 346, 362 (2010) (citing 1914 Md. Laws ch. 800). Elaborating further, the Court of Appeals has explained: "The purpose of the Act is 'to protect workers and their families from hardships inflicted by work-related injuries by providing workers with compensation for loss of earning capacity resulting from accidental injury arising out of and in the course of employment.'" *Hollingsworth v. Severstal Sparrows Point, LLC*, 448 Md. at 655 (quoting *Elms v. Renewal by Andersen*, 439 Md. 381, 399 (2014)).

The Court of Appeals has "repeatedly emphasized" that the Act is "remedial" in nature and "that it 'should be construed as liberally in favor of the injured employees as its provisions will permit in order to effectuate its benevolent purposes.'" *Montgomery County v. Robinson*, 435 Md. 62, 82-83 (2013) (quoting *Howard Cnty. Ass'n for Retarded Citizens, Inc. v. Walls*, 288 Md. 526, 530 (1980)). Accordingly, where the meaning of the Act is unclear, the interpreter should "'resolve any uncertainty in favor of the claimant.'" *Johnson v. Mayor & City Council of Balt.*, 430 Md. at 377-78 (quoting *Breitenbach v. N.B. Handy Co.*, 366 Md. 467, 473 (2001)). On the other hand, a faithful interpreter must not ignore the statute's plain meaning or create ambiguity where none fairly exists, simply to allow an injured worker to prevail. *Reger v. Washington Cnty. Bd. of Educ.*, 455 Md. at 96-97.

The dispute here centers on the term "average weekly wage." Although the current version of the Act includes no formal definition of that term, LE § 9-602(a) "describes the general computation" (*Long v. Injured Workers' Ins. Fund*, 448 Md. at

13

266) of average weekly wage by "list[ing] the elements to be considered as within" it.

*Gross v. Sessinghause & Ostergaard, Inc.*, 331 Md. at 39. It provides, in relevant part:

> (a)(1) Except as otherwise provided in this section, the average weekly wage of a covered employee shall be computed by determining the average of the weekly wages of the covered employee:
>
> > (i) when the covered employee is working full time; and
>
> > (ii) at the time of:
>
> > > 1. the accidental personal injury[.]

LE § 9-602(a)(1).

RBCI and its insurer assert that there is "no uncertainty in the law" as it applies to Mr. Wagstaff's average weekly wage. They focus on the words: "the average of the weekly wages of the covered employee . . . when the covered employee is working full time; and . . . at the time of . . . the accidental injury[.]" They argue that, it is "consistent" with a "plain reading" of these words to require the Commission to determine average weekly wage based solely on the actual earnings before the accident.

In what they characterize as nothing more than a "plain reading," RBCI and its insurer offer a few paraphrases of this provision. In one such attempt, from their opening brief, they say that the statute provides that average weekly wage must be calculated "based upon the wages earned while the Claimant *is working* and at the time of the accidental injury." (Emphasis added.) This paraphrase subtly shifts the meaning of the text by diluting the key phrase "working full time." Those words should not be overlooked. *See Merrill v. State Military Dep't*, 152 Md. 474, 479 (1927) (noting, in dispute over the proper measure of average weekly wage, that the court should "keep[] in

14

mind . . . that [it] shall be taken to mean the average weekly wage earned by an employee when working on 'full time'").

In another such attempt, from their reply brief, RBCI and its insurer assert that under a "plain reading" average weekly wage must be "based upon the *actual weeks worked prior* to the date of accident." (Emphasis added.) If in fact the statute said that average weekly wage must be computed using earnings from the "actual weeks worked prior" to the accident, then we might be persuaded by their interpretation. But the statute does not use those words, or other similar words that might have expressed that same meaning. Instead, it uses a more unusual wording: "the average of the weekly wages of the covered employee . . . when the covered employee is working full time[.]" The meaning of that phrase is not immediately clear for an employee such as Mr. Wagstaff, who was hired for the purpose of working full time, but who was not actually working those full-time hours before the accident. *See Stevenson v. Hill*, 171 Md. 572, 576 (1937) (observing that the term "'full time' is an expression of questionable application in some circumstances"). In our judgment, these attempts by RBCI and its insurer to paraphrase LE § 9-602(a)(1) simply demonstrate that the meaning itself is not apparent from the letter of the statute.[6]

Longstanding precedent indicates that the Act's concept of "average weekly

---

[6] One contemporary author has commented that the meaning of the phrase "working full time" is unclear for employees who, for various reasons, are working less than full-time hours at the time of accident. *See* 1 Clifford B. Sobin, *Maryland Workers' Compensation* § 11:2, at n.9 (2017) (commenting on the "poor wording" of LE § 9-602(a)(1)(i) and describing the provision as "confusing").

wage" has always suggested, to some extent, a projection of what an employee would have gone on to earn if not for the accidental injury. In *Campbell Coal Co. v. Stuby*, 159 Md. 280 (1930), the Court of Appeals considered a dispute over how to instruct a jury about average weekly wage. The employer had asked for an instruction that "'the average weekly wage of the deceased employee was the total amount the said employee *earned* over such period of time immediately preceding his fatal injury as the jury may find it necessary to consider in order to arrive at a fair average divided by the number of weeks embraced by such time.'" *Id.* at 288 (emphasis in original). Instead, the trial court instructed the jury "that 'the average weekly wage of the deceased employee was the total amount the said employee *might have earned working all the time the mines in the region were generally employed* over such period of time, immediately preceding his fatal injury, as the jury may find it necessary to consider in order to arrive at a fair average, divided by the number of weeks embraced by such time[.]'" *Id.* at 287 (emphasis in original). The Court of Appeals reasoned that the trial court's instruction was "in conformity with the statute," which at that time stated "that average weekly wage shall be taken to mean 'the average weekly wage earned by an employee when working on full time[.]'" *Id.* at 288.

Citing *Campbell Coal* and other cases, the Court of Appeals later wrote that "average weekly wage is based on what the employee *would earn* from the employer where working under a specific contract of hire existing between the employer and employee." *Crowner v. Balt. United Butchers Ass'n*, 226 Md. 606, 610 (1961) (emphasis

16

added).[7]  The Court's use of conditional language (i.e., what the employee "might have earned" or what the employee "would earn") is consistent with the Act's overall purpose of compensating injured workers for loss of earning *capacity*.

For his part, Mr. Wagstaff also makes his own attempt at what he calls a "plain reading" of part of the statute.  He purports to rely on LE § 9-602(a)(3), which provides:

> (3) If a covered employee establishes that, because of the age and experience of the covered employee at the time of the accidental personal injury . . . , the wages of the covered employee could be expected to increase under normal circumstances, the expected increase may be taken into account when computing the average weekly wage of the covered employee under paragraph (1) of this subsection.

LE § 9-602(a)(3).

Although Mr. Wagstaff did not cite this provision to the Commission, he argues that the Commission "properly relied on" it in finding his average weekly wage to be $758.00.  He theorizes that the Commission accounted for an "expected increase in salary, with more favorable working conditions when compared to lower weekly wages [that he had] earned while working weather shortened weeks just prior to his accident."

The obvious flaw in Mr. Wagstaff's argument is that an "expected increase" because of weather conditions that have no relation to an employee's age or experience cannot be said to be an increase "because of the age and experience of the covered employee[.]"  LE § 9-602(a)(3).  Even affording the Act a liberal construction, we cannot simply ignore that qualifying phrase.  In other jurisdictions, provisions similar to LE § 9-

---

[7] This Court has said that "[t]he statutory definition of 'average weekly wage' when *Crowner* was decided was substantively the same as LE section 9-602(a)[.]" *Thomas v. Giant Food, LLC*, 174 Md. App. 103, 110 (2007).

602(a)(3) have been interpreted to apply to employees such as "apprentices, student nurses, and recent college graduates." *Jung v. Southland Corp.*, 114 Md. App. 547, 549 (1997) (citations omitted), *aff'd*, 351 Md. 165 (1998). For our purposes, LE § 9-602(a)(3) at most offers some additional confirmation that average weekly wage should represent what the employee "would earn" under the employment contract existing at that time of the injury (*Crowner v. Balt. United Butchers Ass'n*, 226 Md. at 610), which is not necessarily identical to what the employee had "earned" immediately prior to the injury. *See Campbell Coal Co. v. Stuby*, 159 Md. at 287-88.

RBCI and its insurer point out that the Act should not be construed to permit an employee to "receive more compensation by being injured than by working." *Long v. Injured Workers' Ins. Fund*, 448 Md. at 292. In other words, an employee should not "receive a windfall for being injured." *Id.* at 298. They note that "an average weekly wage of $758.00 results in a weekly compensation rate of $506.00[,]" and that Mr. Wagstaff "never earned more than $454.80 in a week while working for [RBCI]." They assert that the Commission's award "makes it more profitable for [Mr. Wagstaff] to be injured than to be working."

This argument depends on the premise that the six weeks in February and March, in which Mr. Wagstaff never worked more than three days per week, was truly representative of his normal working hours. That premise is dubious. *See* 5 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 93.02[1], at 93-28 (2013) (observing that "lack of a full-time employment record" is "[t]he most familiar" of the "various circumstances which would make [a] claimant's actual earnings during a

18

particular past period an unreliable measure of his or her future earnings capacity"). If the six-week sample significantly understated his normal working hours, then using it to determine his benefits would result in an unwarranted windfall for the employer and insurer.

Little imagination is needed to think of scenarios in which an inflexible requirement tying an injured employee's compensation to pre-accident earnings would subvert the goal of compensating employees for lost earning capacity. Suppose that, immediately after an employee's first day of full-time work, an event such as a natural or manmade disaster shut down the place of employment for a few weeks, in which the new employee received no pay; then, immediately upon the employee's return, the employee became disabled in a workplace injury. In such a scenario, an average of actual earnings during the weeks before the injury would not accurately represent what the employee normally would earn from that employer under the contract that was existing at the time of the injury. This unfortunate employee would certainly suffer financial hardship if the employee's compensation were strictly computed by dividing the actual gross earnings by the number of weeks since being hired. In many situations involving recently-hired employees, the rule proposed by RBCI and its insurer would violate the principle that the Act should be construed "to afford substantial, and not merely nominal, relief[.]" *Merrill v. State Military Dep't*, 152 Md. at 478.

Looking beyond LE § 9-602, the parties offer competing interpretations of one of the Commission's regulations. The Workers' Compensation Act broadly empowers the Commission to "adopt regulations to carry out" the Act. LE § 9-309. More specifically,

19

it directs the Commission to "adopt reasonable and proper regulations to govern the procedures of the Commission, which shall be as simple and brief as reasonably possible" (LE § 9-701(1)), and to "regulate and provide for the nature and extent of evidence and proof and for the method of taking and providing evidence and proof to establish a right to compensation[.]" LE § 9-701(4). Under this authority, the Commission promulgated COMAR 14.09.03.06, which establishes the procedure for determining an employee's average weekly wage.

Sections (A), (B), and (C) of this regulation outline a three-stage process. In the first stage, the Commission makes a preliminary determination based on the amount reported by the employee. COMAR 14.09.03.06(A) provides:

> **A. Preliminary Determination.** For the purpose of making an initial award of compensation before a hearing in the matter, the Commission shall determine the claimant's average weekly wage from gross wages, including overtime, reported by the claimant on the employee's claim form.

In the next stage, the employer or its insurer must promptly produce documentation of the actual wages earned by the employee in a 14-week period preceding the accident. COMAR 14.09.03.06(B) states:

> **B. Filing of Wage Statement.** As soon as practicable, the employer/insurer shall file a wage statement containing the following information:
>
> > (1) The average wage earned by the claimant during the 14 weeks before the accident, excluding the time between the end of the last pay period and the date of injury, provided that periods of involuntary layoff or involuntary authorized absences are not included in the 14 weeks;
> >
> > (2) Those weeks the claimant actually worked during the 14 weeks before the accident;

20

(3) Vacation wages paid; and

(4) Those items set forth in Labor and Employment Article, § 9-602(a)(2), Annotated Code of Maryland.[8]

The third stage is the hearing stage, in which the parties may present other evidence so that the Commission may make an accurate determination:

**C. Determination at First Hearing.**

(1) Calculation of the average weekly wage shall be adjudicated and determined at the first hearing before the Commission.

(2) All parties shall be prepared to produce evidence from which the Commission can determine an accurate average weekly wage at the first hearing.

COMAR 14.09.03.06(C)(1)-(2).

The procedural history of this case illustrates this three-stage process. Mr. Wagstaff initially reported weekly wages of $758.00 on his claim form; RBCI filed documentation indicating that he had actually earned around $317.44 per week during six weeks before the accident; and, based on the evidence presented at the first hearing, the Commission determined that his average weekly wage was $758.00.

Focusing on section (B), RBCI and its insurer assert that the regulation "require[s] the average weekly wage to be calculated by determining the average wages earned during the 14 weeks prior to the accidental injury." In fact, the actual text of section (B) says only that "the employer/insurer shall file a wage statement" containing certain

---

[8] LE § 9-602(a)(2) states that "tips" and "the reasonable value of housing, lodging, meals, rent, and other similar advantages" are included in the calculation.

21

information. It does not purport to require the Commission to use any particular method of calculation. By implication, it suggests that, "[*u*]*sually*," the Commission will calculate average weekly wage "by adding gross wages that the employee earned in the fourteen weeks preceding the accidental personal injury and dividing the sum by fourteen." *Long v. Injured Workers' Ins. Fund*, 448 Md. at 267 (emphasis added).

A reading of the entire regulation, however, shows that the 14-week wage statement is not the only evidence that the Commission may consider. If the wage statement were conclusive, then there would be no need for a hearing at which "[a]ll parties" must be prepared to "produce evidence from which the Commission can determine an accurate average weekly wage[.]" COMAR 14.09.03.06(C)(2). Fairly read, this regulation permits parties to offer other evidence to contest whether the 14-week wage statement accurately represents what the employee would earn from the employer under the contract in existence at the time of the injury.[9]

Our reading of the regulation conforms with the analysis of the leading case on the subject: *Gross v. Sessinghause & Ostergaard, Inc.*, 331 Md. 37 (1993). The regulation in effect at that time "stat[ed] that, 'unless otherwise ordered after the hearing, compensation payments shall be based on . . . the average wage earned by the employee during the thirteen weeks before the accident.'" *Id.* at 40 (quoting former version of COMAR 14.09.01.05(B)).

---

[9] *Accord* Theodore B. Cornblatt, et al., *Maryland Workers' Compensation Manual* 48 (18th ed. 2017) (recommending that counsel for claimants "must investigate to see if the earnings during the 14-week period are not typical of the claimant's true earnings background" and should not "merely rely on the employer/insurer's figure").

The employee in that case, Mr. Gross, had worked at a construction firm for two years before being injured. *Id.* at 41. On his claim form, Mr. Gross reported that his wages were $11.00 per hour, from which the Commission initially determined that his average weekly wage was $440.00. *Id.* The employer submitted a wage statement showing that Mr. Gross earned an average of $282.20 during the 13 weeks prior to the accident. *Id.* At a hearing, Mr. Gross presented an income tax form showing that he had earned approximately $400.00 per week throughout the 52 weeks preceding the accident. *Id.* at 42. He argued that, "given the nature of the heavy construction industry in which [he] worked, the yearly earnings better represented his earning capacity." *Id.* The Commission agreed with him and found that his average weekly wage was $400.00. *Id.*

The Court of Appeals rejected the employer's argument that the statute and regulation required the Commission to use the earnings from the 13 weeks before the accident to determine average weekly wage. The Court noted that the statute itself "does not specify a particular time period to be used in calculating a worker's average weekly wage." *Id.* at 39. Thus, "prior to the promulgation of a regulation specifying a time period for calculating [an] injured worker's average weekly wage, the Commission was free to choose an appropriate period on a case-by-case basis." *Id.* at 50. The Court concluded:

> The Commission's [regulation] appears to be designed to address the vast majority of cases in which there is no hearing. In such cases, it provides a definite rule in lieu of a case-by-case basis. The regulation also supplies a standard in those cases in which there is a hearing but where no question arises concerning the appropriate time period or where the Commission decides that it should not depart from the thirteen-week rule. Nevertheless, . . . in a case where there is a hearing, the regulation does not

purport to restrict the Commission in any manner from utilizing a different time period if the Commission deems it appropriate to do so.

*Id.*

As subsequently amended, the regulation is even more explicit in permitting the Commission to consider evidence other than the wage statement. The regulation no longer states that, "unless otherwise ordered after the hearing," payments "shall be based on" wages earned during the 13 weeks prior to the accident. It now states that "the employer/insurer shall file a wage statement containing" information about earnings from the 14 weeks prior to the accident (COMAR 14.09.03.06(B)), and it directs that the ultimate determination should be based on the evidence presented at the hearing. *See* COMAR 14.09.03.06(C). The wage statement still serves as the basis for determining average weekly wage in "the vast majority of cases in which there is no hearing" and in "cases in which there is a hearing but where no question arises concerning the appropriate time period or where the Commission decides that it should not depart" from the usual standard. *Gross v. Sessinghause & Ostergaard, Inc.*, 331 Md. at 50. Yet it remains true that, "in a case where there is a hearing, the regulation does not purport to restrict the Commission in any manner from utilizing a different time period if the Commission deems it appropriate to do so." *Id*.

As part of their argument, RBCI and its insurer suggest that this Court should "endorse a uniform and predictable basis for calculating average weekly wage" to further two "policy considerations." First, they assert that basing average weekly wage solely on actual hours worked and wages earned immediately before the accident would "ensure[]

24

that an employer, its insurer, and the Commission can calculate benefits owed to a claimant *absent a hearing* and disburse benefits as quickly as possible." (Emphasis added.) On a related note, they suggest that such a rule would promote "[p]redictability and administrative ease," even though it would do so "at the price of *some* flexibility in unique or unusual circumstances." *Jung v. Southland Corp.*, 114 Md. App. at 551 (citation and quotation marks omitted).

In our assessment, the Commission has already used its rule-making authority to adopt procedures that it believes will achieve the appropriate balance. By requiring the employer or insurer to promptly file a 14-week wage statement, COMAR 14.09.03.06(B) promotes efficiency in the majority of cases in which average weekly wage is undisputed. In the minority of cases where a party contends that those earnings do not accurately reflect what the employee would earn, COMAR 14.09.03.06(C) allows the parties to present other evidence at a hearing. If the Commission holds a hearing, it can exercise its traditional flexibility to decide the most appropriate basis for its calculation according to the unique facts of each case. *See Gross v. Sessinghause & Ostergaard, Inc.*, 331 Md. at 50.

Like his adversaries, Mr. Wagstaff also proceeds, in part, on the assumption that COMAR 14.09.03.06 "requires" the Commission to calculate average weekly wage based on the 14-week wage statement. He nevertheless emphasizes the language directing the employer or insurer to exclude "periods of involuntary layoff or involuntary authorized absences" (COMAR 14.09.03.06(B)(1)) from the 14-week earnings history. He charges that his employer, in fact, failed to comply with the regulation, because it

25

submitted information that included the days when he could not work because of inclement weather. Under his interpretation, the $758.00 figure does represent an average of actual earnings: an average that excludes all weather-shortened days. RBCI and its insurer encourage us to adopt a much narrower reading, in which the days when an employee does not work because of weather should not be considered "periods of . . . involuntary authorized absences."

We need not decide which interpretation of COMAR 14.09.03.06(B) is correct because, as discussed previously, that section does not control the ultimate determination in cases where the Commission holds a hearing. The controlling provision is COMAR 14.09.03.06(C), which envisions that the Commission will determine average weekly wage based on the evidence presented at the first hearing.[10]

The remaining question is whether, from the evidence that was actually presented at that hearing, the Commission was required to find that Mr. Wagstaff's average weekly wage was $317.44. In this regard, RBCI and its insurer assert that "liability under the . . . Act cannot be premised on speculation and conjecture but must be solely based on the facts contained in the record.'" *Jung v. Southland Corp.*, 114 Md. App. at 549 (quoting *Deichmiller v. Indus. Comm'n of Illinois*, 497 N.E.2d 425, 457 (Ill. App. Ct. 1986)).

---

[10] The clause directing employers and insurers to exclude "periods of involuntary layoff or involuntary authorized absences" from the wage statement is still notable for another reason. By rejecting data from those periods, the Commission implicitly has recognized that a raw average of actual earnings is not the best measure of earning capacity if that average accounts for time in which an employee involuntarily lost the opportunity to work. It would be difficult to reconcile this feature of the regulation with the strict interpretation of the statute offered by the appellants.

26

They argue that the Commission improperly relied on Mr. Wagstaff's "speculative future earnings potential," using a "hypothetical 40-hour workweek," instead of "actual facts" in evidence.

We disagree with the assertion that the Commission made a "purely hypothetical and speculative" determination when it selected the 40-hour week as the basis for its calculation. During the hearing, the Commission heard undisputed testimony that RBCI had hired Mr. Wagstaff to work on a full-time basis, meaning 40 hours per week. At the rate of $18.95 per hour, he could expect to earn $758.00 over a full week, unless the week was shortened by inclement weather. His testimony was sufficient to support the conclusion that $758.00 was a reasonable approximation of what he would normally earn in his position. We agree with the appellants that there was no "definitive evidence" and no "guarantee" that he would have gone on to work 40-hour weeks if not for his injury. But the Commission may draw reasonable inferences even if those inferences fall short of a certainty or near-certainty. *See W.M. Schlosser Co. v. Uninsured Emp'rs' Fund*, 414 Md. 195, 205 (2010) (explaining that the Commission's conclusions are adequately supported as long as "a reasoning mind reasonably could have reached the factual conclusion" reached by the Commission) (citations and quotation marks omitted); *see also* COMAR 14.09.03.09(C)(4) (providing that the hearing commissioner may "give probative effect" to "evidence that reasonable and prudent individuals commonly accept in the conduct of their affairs").[11]

---

[11] Mr. Wagstaff suggests that the Commission also could have considered the voluntary payments that RBCI made *after* the accident (weekly checks of $758.00, which

27

It was also undisputed that Mr. Wagstaff had actually earned about $317.44 per week because he worked only 16.75 hours per week during the six weeks after he was hired. Yet the Commission had reason to conclude that this six-week history did not accurately reflect what he would expect to earn in his position with RBCI. The sample size was exceptionally small, covering less than half of the "fairly deep accounting of the employment history of the employee" that the Commission normally considers (*Montgomery County v. Deibler*, 423 Md. at 73), and a small fraction of the 52-week history that the Commission often considers. *See Gross v. Sessinghause & Ostergaard, Inc.*, 331 Md. at 49-50. The Commission could reasonably conclude that the weather during that period (rain or snow on about three out of every five work days) was abnormal. Given that the parties presented the Commission with only two, imperfect options, it was not unreasonable to conclude that $758.00 was the better approximation of what Mr. Wagstaff would have earned if not for the injury.

As a secondary line of argument, RBCI and its insurer search for support from case law interpreting the term "average weekly wage." Although they recognize that no Maryland case "directly address[es] how to calculate average weekly wages in situations such as this one[,]" they assert that some opinions are "instructive." For the most part,

---

were later reduced to $500.00) as evidence of his average weekly wage at the time of the accident. We disagree. Under the statute, average weekly wage is "fixed . . . at the time of the accidental personal injury" and "ordinarily can be determined only by reference to when the applicable accidental personal injury occurred." *Jung v. Southland Corp.*, 351 Md. 165, 171-72 (1998). Moreover, it would be unfair to employers and unwise as a policy matter to penalize an employer for its generosity to an injured employee after an accident.

the issues in those cases are far removed from the issues implicated in the calculation of

Mr. Wagstaff's average weekly wage.[12]

Only one case cited by the appellants comes close to addressing the issues

implicated here: *Stevenson v. Hill*, 171 Md. 572 (1937). That case does not concern the

specific problem of a limited sample size, but it does generally address how to determine

average weekly wage when the employee has a discontinuous work schedule.

The employee in that case sustained a fatal injury in 1933 while working as an

inspector for a coal company. *Id.* at 573. "Because of the general economic depression,

and especially [the depression] in coal mining," the mine had operated infrequently in the

months before the accident. *Id*. at 574. The employer's mines were open for an average

of 203 days during the year before the accident, and it was undisputed that this time of

operation was no shorter than that of other mines in the region. *Id.* at 574-75. The

---

[12] As discussed previously, *Gross v. Sessinghause & Ostergaard, Inc.*, 331 Md. at 50, upheld a determination of average weekly wage, after a hearing, based on a 52-week earnings history rather than a 13-week wage statement. The Court did not decide how the Commission should calculate average weekly wage when neither data set is available because the employee was injured after just six weeks. In *Jung v. Southland Corp.*, 351 Md. at 171-72, the Court held that the Commission may not recalculate average weekly wage based on a wage increase that occurred after the date of the injury. The opinion does not address whether the Commission may determine average weekly wage based on the hours generally discussed at the time of hiring, before the injury. In *Long v. Injured Workers' Ins. Fund*, 448 Md. at 255, the Court held that a sole proprietor's average weekly wage ordinarily should be based on the proprietorship's net profit, because net profit is the "best approximation of the earnings that a sole proprietor actually takes home[.]" *Id*. For newly-hired employees such as Mr. Wagstaff, we do not accept the generalization that actual pre-accident earnings are the best approximation of what the employee takes home. Under many circumstances, an approximation based on the hours discussed at the time of hiring would be more accurate than a calculation based on earnings from a small and arguably unrepresentative time period.

29

Commission determined the employee's average weekly wage using his earnings from slightly over one year before the accident, during which he had worked 202 days. *Id.* at 574.

Challenging that decision, the employee's widow contended that "the basis under the statute" for calculating average weekly wage was what the employee would have earned "if the mines had been working to capacity, or to the limit of daily and weekly working time in the region, eight hours a day for six days a week[.]" *Id.* at 575. The Court rejected that theory and explained that the statutory term "full time" referred to "'all the time the mines in the region,' including the mine of [the employer] 'were generally employed.'" *Id.* (quoting *Campbell Coal Co. v. Stuby*, 159 Md. at 288). The Court reasoned that "variation in working time, reducing opportunities to earn, must be a factor in the computation of average of weekly wages earned." *Stevenson v. Hill*, 171 Md. at 577. The Court endorsed the view that average weekly wage should reflect the "'earnings in a normal week, regard being had to the known and recognized incidents of the employment[.]'" *Id.* at 578 (quoting *Anslow v. Colliery Co.*, [1909] A.C. 435, 437 (1909)).[13]

RBCI and its insurer contend that, under *Stevenson v. Hill*, an employee's

---

[13] RBCI and its insurer assert that Mr. Wagstaff presents the "same argument" made by the employee's widow in *Stevenson v. Hill* – i.e., that "full time" under the statute means the hours when the employer is operating at maximum capacity. In fact, Mr. Wagstaff contends that his average weekly wage should be based on a 40-hour week because he and his employer had discussed those hours at the time of hiring. Nothing in *Stevenson v. Hill* indicates that the employee's widow presented evidence that the employer and employee had discussed a 48-hour work week at the time of hiring.

"inability to work because the job site is closed" because of weather "should be taken into consideration when calculating average weekly wage." Although we might accept that general proposition, the evidence presented here regarding the employee's normal work hours is not comparable to the evidence from *Stevenson v. Hill*. There, the record included the employee's 53-week earning history and information about the employer's days of operation in a full year before the accident, which they had agreed were no shorter than those of others in the region. *Stevenson v. Hill*, 171 Md. at 574-75. Under those circumstances, the claimant could not reasonably dispute that the 53-week earnings history was representative of what the employee would earn working all the time his employer and other employers in the region were generally operating.

The same cannot be said here. RBCI and its insurer relied exclusively on the wage statement covering the six-week period before the accident. They did not provide information about the total hours (including any overtime) that lift operators for RBCI, or similarly-situated employees at RBCI or comparable firms, normally work throughout the year. It is conceivable that RBCI or Selective Way could have compiled that type of information, because workers' compensation insurance premiums are typically based on audits of the employer's payroll figures. *See* Richard P. Gilbert et al., *Maryland Workers' Compensation Handbook* § 9.06[1], at 9-58 (3d ed. 2007). They had ample opportunity to present that type of information, either at the hearing before the Commission or to the circuit court for a de novo determination. *See generally Bd. of Educ. for Montgomery Cnty. v. Spradlin*, 161 Md. App. 155, 187-88 (2005). Instead of doing so, RBCI and its insurer simply insisted throughout this case that, as a matter of

31

law, evidence of what Mr. Wagstaff earned during the six weeks before his injury is conclusive proof of his average weekly wage. Even now, they do not seek a remand to offer evidence comparable to the evidence from *Stevenson v. Hill*; they only seek an order finding that the correct average weekly wage is $317.44.

Ultimately, just as the restriction suggested by RBCI and its insurer cannot be found in the statute or regulation, so too it cannot be found in case law. Neither *Stevenson v. Hill* nor any other case cited by the appellants stands for the proposition that a construction worker's six-week earnings history, *without more*, is conclusive evidence of what that worker would expect to earn in a normal week.[14]

## CONCLUSION

For the reasons discussed above, we conclude that the Commission's decision was not premised on an error of law. The Commission received evidence that Mr. Wagstaff was injured only a short time after being hired to work 40 hours per week, and the circumstances called into question whether the actual hours worked in that time period were representative of his normal working hours. Having been presented with this information and with only two options for determining Mr. Wagstaff's average weekly

---

[14] In part of their argument, RBCI and Selective Way appear to appreciate that a six-week earning history is not necessarily the best indication of what an employee would earn. They assert that, if Mr. Wagstaff "had worked 60 hours for the six weeks prior to the accidental injury, he would not be arguing that the Court should consider the fact that he was hired for the purpose of working a 40-hour week." In that situation (an injury after a short period of heavy overtime), nothing would prevent the employer or insurer from presenting evidence like the evidence offered in *Stevenson v. Hill*, to show the hours that the employee would earn over a longer period of time, working all the time that the employer and other comparable employers in the region generally operated.

wage, the Commission was not required to calculate his average weekly wage based on the actual earnings in the six-week period before the accident.  The judgment of the circuit court confirming the decision of the Commission is hereby affirmed.

**JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**