*Montgomery County, Maryland v. Anthony G. Cochran and Andrew Bowen*, Nos. 662 & 2930, September Term, 2018. Opinion by Nazarian, J.

**WORKERS' COMPENSATION – OCCUPATIONAL DEAFNESS – CALCULATION OF TOTAL AVERAGE HEARING LOSS – MEANING OF "LOWEST MEASURED LOSSES" IN LE § 9-650(b)(2)(i)**

Retired firefighter filed for compensation for occupational deafness. Two audiograms were performed. The earlier-in-time audiogram showed more hearing loss than the later one. The Maryland Workers' Compensation Commission (the "Commission") did not err in calculating firefighter's total average hearing loss under LE § 9-650(b)(2)(i) by using the results of the earlier-in-time audiogram. The term "lowest measured losses" in LE § 9-650(b)(2)(i) does not direct the Commission to use the lowest hearing losses ever tested and recorded for an occupational deafness claimant. Instead, it sets forth a procedure and formula for calculating the level of a claimant's hearing loss during a single audiogram, and doesn't dictate which results among multiple audiograms the Commission must select.

**WORKERS' COMPENSATION – OCCUPATIONAL DEAFNESS – CALCULATION OF TOTAL AVERAGE HEARING LOSS – CALCULATION OF DEDUCTION FOR "EACH YEAR OF THE COVERED EMPLOYEE'S AGE OVER 50 AT THE TIME OF THE LAST EXPOSURE TO INDUSTRIAL NOISE" UNDER LE § 9-650(b)(3)**

Retired firefighters filed for workers' compensation for occupational deafness. The Commission did not err in calculating the deduction under LE § 9-650(b)(3) from each firefighter's total average hearing loss by counting the number of years between each firefighter's 50th birthday and the respective dates each retired. The date of a claimant's "last exposure to industrial noise" under LE § 9-650(b)(3) is not the date his audiogram was performed, under the plain language of the statute. Instead, it is the date of his last exposure to harmful noise at work, and the Commission did not err in determining that date to be the firefighters' respective retirement dates.

**WORKERS' COMPENSATION – PERMANENT PARTIAL DISABILITY BENEFITS – OCCUPATIONAL DISEASE – DISABLEMENT REQUIREMENT UNDER LE § 9-502 – TINNITUS – "OTHER CASES" LOSS UNDER LE § 9-627(k)**

Retired firefighter filed for workers' compensation for tinnitus, commonly known as a ringing in the ears. The Commission erred in awarding permanent partial disability benefits to the firefighter. Whereas compensation for occupational deafness may be awarded without a showing of disablement, a showing of disablement is required for compensation for other occupational diseases. Because tinnitus is not compensable as part of occupational deafness under LE § 9-505 and § 9-650 under the plain language of those statutes and because the firefighter made no showing of disablement from his tinnitus, the Commission

erred in awarding permanent partial disability benefits. But the Commission's categorization of tinnitus as an "unscheduled" or "other cases" loss under LE § 9-627(k) was not in error.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 662 & 2930

September Term, 2018

———————————————————————

MONTGOMERY COUNTY, MARYLAND

v.

ANTHONY G. COCHRAN AND
ANDREW BOWEN

———————————————————————

Nazarian,
Wells,
Adkins, Sally A.
   (Senior Judge, Specially Assigned),

JJ.

———————————————————————

Opinion by Nazarian, J.

———————————————————————

Filed: November 1, 2019

\* Judge Steven B. Gould did not participate in
the Court's decision to report this opinion
pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Warning lights are flashing down at Quality Control
Somebody threw a spanner and they threw him in the hole
There's rumors in the loading bay and anger in the town
Somebody blew the whistle and the walls came down
There's a meeting in the boardroom, they're trying to trace the smell
There's leaking in the washroom, there's a sneak in personnel
Somewhere in the corridor someone was heard to sneeze
Goodness me, could this be Industrial Disease?[1]

These appeals plunge us into uncharted waters deep in the "murky depths" of Maryland's workers' compensation law. *Subsequent Injury Fund v. Teneyck*, 317 Md. 626, 631 (1989). Anthony Cochran and Andrew Bowen were firefighters for Montgomery County for over thirty years. Both developed hearing loss from exposure to loud noises they encountered repeatedly on the job. They also developed tinnitus, a condition commonly described as a ringing in the ears. Several years after retiring, they filed claims for workers compensation benefits for their hearing loss and, in Mr. Bowen's case, tinnitus as well. Their claims raise unresolved questions about the inputs for the calculation of hearing loss under § 9-650(b) of the Labor and Employment Article ("LE")[2] and about the appropriate classification of tinnitus under LE § 9-627(k).

The Maryland Workers' Compensation Commission (the "Commission") awarded benefits to both claimants. The County filed separate petitions for judicial review in the Circuit Court for Montgomery County. The circuit court affirmed the decisions of the Commission and the County appeals. We affirm the judgment in Mr. Cochran's case in *toto*

---

[1] "Industrial Disease," Dire Straits, from *Love Over Gold* (Vertigo Records 1982).

[2] The Maryland Workers' Compensation Act (the "Act") is codified at Title 9 of the Labor and Employment Article of the Maryland Code. Unless otherwise indicated, all statutory citations herein are to Maryland Code (1991, 2016 Repl. Vol.) of that article.

and affirm the judgment in Mr. Bowen's case except as to the award of permanent partial disability benefits for his tinnitus.

## I.     BACKGROUND

### A. Anthony G. Cochran

Mr. Cochran was a Montgomery County fire fighter for about 34 years. He retired in November 2013, when he was approximately 57 years old. He underwent an audiogram about two years later, on September 23, 2015, and the parties agree that it showed hearing loss in both ears.

On March 21, 2016, Mr. Cochran filed a claim with the Commission seeking compensation for occupational deafness. About two months later, on May 23, 2016, Mr. Cochran had another audiogram that also showed some hearing loss in each ear, although to a different (and overall lesser) degree than the first test.

On July 15, 2016, the Commission held an evidentiary hearing. Six days later, it entered an order finding that Mr. Cochran had sustained an occupational disease of hearing loss arising from his employment with the County as a firefighter, and that the date of disability was the date of the first audiogram, September 23, 2015. The Commission ordered the County to pay Mr. Cochran's "causally related medical bills."

The County filed a petition for judicial review of the Commission's decision. On April 27, 2017, the circuit court held a hearing and affirmed the Commission's decision, stating its reasoning in open court, and entering a written order on May 2, 2018.

### B. Andrew Bowen

Mr. Bowen was a firefighter for the County for about 36 years and retired in

September 2013, when he was approximately 56 years old. On August 12, 2016, Mr. Bowen filed a claim with the Commission seeking compensation for occupational deafness. Several months later, on October 13, 2016, Mr. Bowen had an audiogram, and the parties agree that the results showed hearing loss in both ears. The parties also do not dispute that Mr. Bowen suffers from tinnitus.

The parties did not identify, and we did not find, any expert testimony in the record defining tinnitus or describing its clinical symptoms. As defined in *Stedman's Medical Dictionary*, a person suffering from tinnitus "hears" sound that isn't generated by a stimulus outside of the ear:

> Perception of a sound in the absence of an environmental acoustic stimulus. The sound can be a pure tone or noise including (ringing, whistling, hissing, roaring, or booming) in the ears. Tinnitus is usually associated with a loss of hearing. The site of origin of the sound percept may be in the central auditory pathways even if the initial lesion is in the end organ of the auditory system.

Tinnitus, *Stedman's Medical Dictionary* (28th ed. 2006). For his part, Mr. Bowen testified before the Commission that his tinnitus "is constant; it's ongoing; it's 24/7"; that it interferes with his ability to understand others while speaking; and that it affects his ability to sleep:

> The ringing in my ears is constant; it's ongoing; it's 24/7. It affects everything that you do. Even with hearing aids, the ringing in your ears is always the [prevalent] sound that you hear. It interferes with normal hearing when you're speaking especially if you have a group of people you, virtually, have to look at that person to understand that what they're saying. It makes it impossible even with hearing aids to, actually, go to a movie theater; you just, you just can't understand what's [] being said.

> The hearing -- the ringing also affects trying to sleep at night. There are times when you can't sleep because it's like you're hearing noise all the time. It just -- I realize at this point in time there's not a whole lot that they can do to fix it, but it's just constant, ongoing. Some days are better than others, but overall it's not a nice thing to have.[3]

On December 30, 2016, the Commission held a hearing, and on January 19, 2017, issued a Compensation Order that found "that [Mr. Bowen] sustained an occupational disease of binaural hearing loss and tinnitus arising out of and in the course of employment and finds that the first date of the claimant's disablement was January 24, 2005." The Commission ordered the County to "pay [his] causally related medical expenses" and authorized hearing aids.

The January 2017 order also stated that Mr. Bowen's case "will be held for further consideration by this Commission as to whether the claimant has sustained permanent partial disability, if any; the case will be reset only on request." On December 5, 2017, the Commission held another hearing at which it heard testimony and received evidence. On

---

[3] Dr. Jonathan Gitter, M.D., Mr. Bowen's expert, submitted a report in support of Mr. Bowen's claim, which stated the following with respect to Mr. Bowen's tinnitus:

> The patient noted problems with his hearing about 15 years ago and most troubling he developed tinnitus about 10 years ago. The tinnitus is constant and it affects his ability to fall asleep as well as is very annoying and grating during the day.

Dr. Mark A. Dettelbach, M.D., the County's expert, also submitted a report concerning Mr. Bowen, and stated the following concerning his tinnitus:

> He noted tinnitus for the first time around six or seven years ago when it became bothersome. His tinnitus ranges in severity from mild-to-moderate. He is used to it and it does not bother him that much on most days.

December 15, 2017, the Commission issued an order awarding Mr. Bowen compensation for a permanent partial disability for 14.875% loss of the use of both ears and for "2% industrial loss of use of the body" from tinnitus. The Commission awarded compensation of $257 per week for a period of 47.1875 weeks.[4]

The County sought judicial review of the Commission's decision. On October 12, 2018, the circuit court held a hearing on cross-motions for summary judgment. The court granted Mr. Bowen's motion for summary judgment and affirmed the decision of the Commission, stating its reasoning on the record in open court, and entering a written order on October 17, 2018.[5]

---

[4] The December 2017 Order stated in relevant part:

> [] PERMANENT PARTIAL DISABILITY: Resulting in 14.875% loss of use of the both ears (bilateral hearing loss); and a further permanent partial disability under "Other Cases" amounting to 2% industrial loss of use of the body as the result of an injury to the tinnitus; at the rate of $257.00, payable weekly, beginning January 25, 2005, for a period of 47.1875 weeks.

[5] The parties do not dispute that Mr. Bowen's audiogram showed hearing loss in both ears, but did dispute the Commission's hearing loss calculation: the Commission's Award of Compensation indicated a 14.875% bilateral hearing loss but the County asserted that the correct figure was 11.125%.

The County raises this issue on appeal and represents in its brief that the parties and the circuit court "agreed" that the Commission made a mathematical error and that the 11.125% figure is correct. Our review of the whole transcript of the October 12, 2018 hearing and the circuit court's October 17, 2018 order reveals no such agreement. Indeed, the circuit court's October 2018 order does not memorialize any decision on this point—it simply directed the Commission to "make any mathematical correction it deems necessary in light of the October 13, 2016 audiogram demonstrating a binaural hearing loss [] of 11.125%." For his part, Mr. Bowen does not address this dispute at all in his appellate brief—he appears to assume, without explanation or any reference to the dispute in the circuit court, that the 14.875% figure is correct. We decline to resolve this arithmetic

5

**\*\*\***

The County appealed. We supply additional facts as necessary below.

## II. DISCUSSION

The County states one question concerning Mr. Cochran[6] and three questions

concerning Mr. Bowen,[7] but they all boil down to three questions. *First*, did the

---

dispute, and affirm the circuit court's direction to the Commission to correct any mathematical errors, to the extent they exist.

[6] The County raises the following Question Presented as to Mr. Cochran:

> Did the trial court err in finding Appellee sustained a compensable binaural occupational deafness claim under the Act with a date of disablement of September 23, 2015?

Mr. Cochran identifies two Questions Presented:

> 1. Where it is axiomatic that a fact finder is free to determine the weight of the evidence before it, and there is nothing in LE § 9-650 that requires the Commission to use the lowest hearing test *ever* done (*or* only the *most recent*), was the Commission correct, as an independent fact finder, in choosing to use the September 2015 hearing test which showed Fire Fighter Cochran had demonstrable hearing loss rather than the later test done by the County's hired expert?

> 2. Since LE § 9-650(b)(3)'s language explicitly instructs that one-half (½) decibel be deducted for each year a claimant is over age fifty (50) "*at the time of the last exposure to industrial noise*," and since it is undisputed that Fire Fighter Cochran had no exposure to "industrial noise" after he retired at age fifty-seven (57), was the Commission correct in following the plain meaning of the statute and deducting three and one half (3 ½) decibels in calculating his hearing loss?

[7] The County raises three Questions Presented as to Mr. Bowen:

> Did the trial court err in calculating the permanent partial disability as 11.125% binaural hearing loss under the Act?

> Did the trial court err in granting a permanent partial disability award for tinnitus separately from hearing loss under the Act?

6

Commission err in calculating Mr. Cochran's average hearing loss under LE § 9-650(b)(2) by using the results of his initial, earlier-in-time audiogram that showed more hearing loss than the later-in-time audiogram? *Second*, did the Commission err in determining, for Mr. Cochran and Mr. Bowen both, that the decibels deducted from the total average hearing loss under LE § 9-650(b)(3) should be calculated by counting the number of years between

> Did the trial court err when it ordered that the tinnitus be categorized as an "Other Cases" injury instead of an injury to the scheduled member (both ears) specifically mentioned in the Act?

Mr. Bowen phrases the questions presented as follows:

> 1. Since Maryland Labor and Employment Article § 9-650 expressly instructs that one-half (½) decibel be deducted from the total average decibel loss for each year the claimant is over age fifty (50) "*at the time of the last exposure to industrial noise*," and since Fire Fighter Bowen had no exposure to "*industrial noise*" after he retired as a fire fighter at the age of fifty-six (56), was the Commission correct in following the plain meaning of the statute and deducting three (3) decibels from Appellee's hearing loss?

> 2. Given that LE § 9-745 instructs that the Commission's decision is "presumed to be correct", was the circuit court correct, in an "on the record" appeal where appellant presented no new evidence, to af[f]irm the Commission's factual finding that Appellee suffered a 14.875% loss of hearing and a 2% loss of tinnitus?

> 3. Given that LE § 9-627(k) explicitly reads that in "all cases of permanent partial disability not listed in subsections (a) through (j) of this section, the Commission *shall* determine the percentage by which the industrial use of the covered employee's body was impaired…" under the section marked "other cases, (500 weeks)" and since tinnitus is not mentioned anywhere in subsections (a) through (j), were the Commission and circuit court correct in calculating Appellee's tinnitus under § 9-627(k)'s "other cases (500 weeks)"?

7

the date the firefighter turned fifty and the date each firefighter retired (as opposed to the date the hearing test or audiogram was performed)? *Third*, did the Commission err in awarding permanent partial disability benefits to Mr. Bowen for tinnitus under LE § 9-627(k) as an "unscheduled" or "other cases" loss?

### A. Standard of Review

When reviewing workers' compensation awards in cases where the claimant sought review on the record (rather than a de novo review involving a new evidentiary hearing), we look through the decision of the circuit court and evaluate the Commission's decision directly. *W.R. Grace & Co. v. Swedo*, 439 Md. 441, 452–53 (2014). Our task is "to determine whether the Commission: (1) justly considered all of the facts about the . . . occupational disease . . . ; (2) exceeded the powers granted to it under [the Act]; or (3) misconstrued the law and facts applicable in the case decided." LE § 9-745(c). "The court must confirm the decision unless it determines that the Commission exceeded its authority or misconstrued the law or facts." *Richard Beavers Constr., Inc. v. Wagstaff*, 236 Md. App. 1, 13 (2018) (*citing Uninsured Empl'rs' Fund v. Pennel*, 133 Md. App. 279, 288–89 (2000)).

That said, the Act also provides that in workers' compensation appeals, "the decision of the Commission is presumed to be prima facie correct." LE § 9-745(b)(1). In this case, though, the parties dispute what that means: the firefighters argue that the Commission's decisions on questions of law are entitled to "great deference," but the County argues that LE § 9-745(b) applies only to questions of fact and that the Commission's decisions on questions of law are entitled to "no deference." Both sides are

8

overreaching. LE § 9-745(b)'s presumption of correctness "does not extend to questions of law, which we review independently." *Montgomery Cty. v. Deibler*, 423 Md. 54, 60 (2011); *accord Pro–Football, Inc. v. McCants*, 428 Md. 270, 283 (2012) (courts are "under no constraint" to affirm the Commission's decision if it is "premised solely upon an erroneous conclusion of law" (cleaned up)). But courts nevertheless may "afford the Commission a degree of deference, as appropriate, in its formal interpretations of the Workers' Compensation Act." *Deibler*, 423 Md. at 60 (*citing Breitenbach v. N.B. Handy Co.*, 366 Md. 467, 485 (2001)); *accord Calvo v. Montgomery Cty.*, 459 Md. 315, 325–26 (2018) ("Although the Commission is entitled to deference in its interpretation of the statute it administers, we may still consider whether its legal conclusions were erroneous.") (*citing Wal Mart Stores, Inc. v. Holmes*, 416 Md. 346, 359 (2010) and *W.M. Schlosser Co. v. Uninsured Emp'rs' Fund*, 414 Md. 195, 204 (2010)).

Resolving these questions requires us to construe and apply several sections of the Act. In interpreting these statutes, we seek "to ascertain and effectuate the real and actual intent of the Legislature." *Gardner v. State*, 420 Md. 1, 8 (2011) (*quoting State v. Johnson*, 415 Md. 413, 421 (2010)). We "look first to the language of the statute, giving it its natural and ordinary meaning." *Holmes*, 416 Md. at 385. When, as here, a statute is not ambiguous, we look at the "normal, plain meaning" of the statute "within the context of the statutory scheme to which it belongs" and "seek to reconcile and harmonize" the statute's parts. *State v. Bey*, 452 Md. 255, 265–66 (2017) (emphasis added) (quotations and citations omitted).

A few specific principles of statutory interpretation apply to the Workers'

9

Compensation Act. LE § 9-102(a) demands that the statute "be construed to carry out its general purpose," and LE § 9-102(b) adds that it is not to be "strictly construed." *See Breitenbach*, 366 Md. at 472; *Wagstaff*, 236 Md. App. at 14. This makes sense in light of the Act's overarching purpose "to protect workers and their families from hardships inflicted by work-related injuries . . . ." *Howard Cty. Assoc. for Retarded Citizens, Inc. v. Walls*, 288 Md. 526, 531 (1980) (*citing Queen v. Agger*, 287 Md. 342, 343 (1980)). Even so, all sections of the Act "must be read together, in conjunction with one another, to discern the true intent of the legislature" and "we seek to avoid an interpretation which would lead to an untenable or illogical outcome." *Breitenbach*, 366 Md. at 472.

## B. The Statutory Scheme

An understanding of the questions before us and the parties' arguments requires a 30,000-foot look at the statutory scheme.

"Workers' compensation encompasses two main categories of compensable events: accidental personal injury and occupational diseases." *Green v. Carr Lowery Glass Co., Inc.*, 398 Md. 512, 516–17 (2007). These two cases involve hearing loss, which "may fall into either category, depending on whether the employee experienced a sudden traumatic event or was exposed repeatedly to loud noises." *Id.* at 517. Neither Mr. Cochran nor Mr. Bowen alleges that his hearing loss (or in Mr. Bowen's case, his tinnitus) was caused by a sudden traumatic event. Both allege that their respective conditions are occupational diseases.

### 1. Compensation For Occupational Diseases, Generally

"Occupational disease" is "a disease contracted by a covered employee: (1) as the

result of and in the course of employment; and (2) that causes the covered employee to become temporarily or permanently, partially or totally incapacitated." LE § 9-101(g). Ordinarily, a claimant's right to compensation for a disability caused by occupational disease is governed by LE § 9-502. *Yox v. Tru-Rol Co., Inc.*, 380 Md. 326, 335 (2004). That section essentially provides that an employer is liable to its employees for an "occupational disease" that is attributable to the type of employment and that resulted from it.[8] LE § 9-502(c)–(d); *see Smith v. Howard Cty.*, 177 Md. App. 327, 331–32 (2007).

---

[8] LE § 9-502(c) and (d) provide, in relevant part:

> (c) Subject to subsection (d) of this section and except as otherwise provided, an employer and insurer to whom this subsection applies shall provide compensation in accordance with this title to:
>
> > (1) a covered employee of the employer for disability of the covered employee resulting from an occupational disease; or
> >
> > (2) the dependents of the covered employee for death of the covered employee resulting from an occupational disease.
>
> (d) An employer and insurer are liable to provide compensation under subsection (c) of this section only if:
>
> > (1) the occupational disease that caused the death or disability:
> >
> > > (i) is due to the nature of an employment in which hazards of the occupational disease exist and the covered employee was employed before the date of disablement; or
> > >
> > > (ii) has manifestations that are consistent with those known to result from exposure to a biological, chemical, or physical agent that is attributable to the type of employment in which the covered employee was employed before the date of disablement; and
> >
> > (2) on the weight of the evidence, it reasonably may be concluded that the occupational disease was incurred as a

11

But it is not enough just to be injured: LE § 9-502 requires "[a]ctual incapacity from employment (whether total or partial)" before an employee is eligible for compensation due to occupational disease. *Miller v. Western Elec. Co.*, 310 Md. 173, 187 (1987); *Belschner v. Anchor Post Prods., Inc.*, 227 Md. 89, 93 (1961), *superseded by statute on other grounds as stated in Crawley v. Gen. Motors Corp.*, 70 Md. App. 100 (1987); *Yox*, 380 Md. at 335. Specifically, LE § 9-502(a) defines "disablement" as "the event of a covered employee becoming partially or totally **incapacitated**: (1) because of an occupational disease; and (2) from performing the work of the covered employee in the last occupation in which the covered employee was injuriously exposed to the hazards of the occupational disease" (emphasis added). The Act does not define "incapacitated," but the Court of Appeals has interpreted LE § 9-502 and its predecessors to mean that the covered employee must not actually be able to perform his work. *See Belschner*, 227 Md. at 93 ("[A]n employee is not incapacitated within the intent of the law 'if, though injured, [he] still has the capacity, the ability to, and does continue to perform his regular work, for which he was employed . . . .") (*quoting Lumbermen's Reciprocal Ass'n v. Coody*, 278 S.W. 856 (Tex.Civ.App. 1926)); *accord Miller*, 310 Md. at 187.

### 2. Compensation for Occupational Deafness

Even though occupational deafness falls within the broad category of "occupational diseases," *Green*, 398 Md. at 524, the Act treats compensation for occupational deafness differently than it treats occupational diseases generally—for deafness, incapacitation or

---

result of the employment of the covered employee.

12

disablement are not required. Other cases have described in depth the evolution of this aspect of the law concerning occupational deafness, *see, e.g.*, *Green*, 398 Md. 512; *Yox*, 380 Md. 326; *Tru-Rol Co., Inc. v. Yox*, 149 Md. App. 707 (2003), *aff'd*, 380 Md. 326 (2004); *Crawley*, 70 Md. App. 100, but it will suffice here to say that compensability for occupational deafness does not fall under LE § 9-502, as other occupational diseases do, but under LE § 9-505 instead. *Green*, 398 Md. at 523; *Yox*, 380 Md. at 336. That section provides, in relevant part, that an employee is entitled to compensation for hearing loss within certain frequencies, and, notably, need not prove incapacitation or disablement to recover:

> Except as otherwise provided, an employer shall provide compensation in accordance with this title to a covered employee for loss of hearing by the covered employee due to industrial noise in the frequencies of 500, 1,000, 2,000, and 3,000 hertz.

LE § 9-505(a); *see also Green v. Carr Lowery Glass Co., Inc.*, 170 Md. App. 845, 516 (2006) (the General Assembly's purpose in enacting LE § 9-505 was "to make occupational hearing loss compensable without regard to 'disablement,'" that is, without regard to a claimant's "inability to work or loss of wages") (*quoting Crawley*, 70 Md. App. at 107 ), *aff'd*, 398 Md. 512 (2007); *accord Yox*, 380 Md. at 336. But although there is no disablement/incapacitation requirement, occupational deafness claimants are entitled to compensation only if they can establish hearing loss "within the specified technical parameters" defined in LE § 9-650. *Green*, 170 Md. App. at 518. We discuss these provisions in more depth below, but in brief, LE § 9-650 sets forth not only the technical standards for hearing tests, but also the mathematical formula for calculating the average

hearing loss.

### 3. Benefits: Generally and for Permanent Partial Disability under LE § 9-627

Once employees establish their right to compensation for occupational disease (under either LE § 9-502 or § 9-505), they are eligible to receive benefits. These fall generally into four categories: medical benefits, disability benefits, death benefits, and vocational rehabilitation benefits. *See* Richard P. Gilbert, *et al.*, *Maryland Workers' Compensation Handbook* § 9.01 at 9-3 (4th ed. 2014). In this case, the Commission ordered the County to pay Mr. Cochran's and Mr. Bowen's "causally related" medical expenses. In addition, the Commission ordered the County to pay permanent partial disability benefits to Mr. Bowen for both his hearing loss and his tinnitus.[9] The County objects to the award of permanent partial disability benefits for Mr. Bowen's tinnitus.

Benefits for permanent partial disability awarded under LE § 9-627 are "expressed by a number of dollars per week for a fixed number of weeks." *Swedo v. W.R. Grace & Co.*, 211 Md. App. 391, 393 (2013), *aff'd*, 439 Md. 441 (2014); *see also* LE § 9-626 through § 9-630. LE § 9-627 classifies the body into two categories: "scheduled" losses or injuries and "unscheduled" losses or injuries,[10] which also are called "other cases." *Ralph*

---

[9] Disability benefits are divided into several subcategories, including temporary partial, temporary total, permanent partial, and permanent total. *Ralph*, 102 Md. App. at 394–95. Mr. Bowen was awarded permanent partial disability benefits.

[10] Although the terms "scheduled" and "unscheduled" do not appear in LE § 9-627, cases interpreting that section commonly use those terms, likely because the term "scheduled" did appear in a predecessor version of that section. *See Teneyck*, 317 Md. at 628–29 ("Section 36 of Article 101 declares that '[e]ach employee . . . entitled to receive compensation under this article shall receive the same in accordance with the following schedule . . . .' It then sets forth a number of '*schedules*.'") (emphasis added); *see also Sears Roebuck and Co., Inc. v. Ralph*, 340 Md. 304, 310, 315 (1995) (using the term

*v. Sears Roebuck & Co.*, 102 Md. App. 387, 396 (1994), *aff'd*, 340 Md. 304 (1995).

To determine the duration of permanent partial disability payments for scheduled losses, the Commission determines the extent of the body part's disability, then apportions the number of weeks for which compensation is to be paid.[11] For example, if a claimant

___

"scheduled" in interpreting LE § 9-627); *Anderson v. Bd. of Educ. of Montgomery Cty.*, 192 Md. App. 343, 346 (2010) (same). We employ the same usage here.

[11] We reproduce the relevant parts of the statute here for reference:

> 9-627. Duration of Compensation.
>
> (a) In general.
>
> If a covered employee is entitled to compensation for a permanent partial disability under this Part IV of this subtitle, the employer or its insurer shall pay the covered employee compensation for the period stated in this section.
>
> ***
>
> (d) Loss of other toes, hand, arm, foot, leg, eye, hearing, or septum.
>
>> (1) Compensation shall be paid for the period listed for the loss of the following:
>>
>>> (i) 1 of the toes other than the great toe, 10 weeks;
>>>
>>> (ii) a hand, 250 weeks;
>>>
>>> (iii) an arm, 300 weeks;
>>>
>>> (iv) a foot, 250 weeks;
>>>
>>> (v) a leg, 300 weeks; and
>>>
>>> (vi) an eye, 250 weeks.
>>
>> (2) Compensation shall be paid for the period listed for:
>>
>>> (i) the total loss of hearing of 1 ear, 125 weeks; and
>>>
>>> (ii) the total loss of hearing of both ears, 250 weeks.
>>
>> (3) Compensation shall be paid for a perforated nasal septum for 20 weeks.
>
> ***

15

sustains a 25% loss of use of his hand and 250 weeks of compensation may be awarded for a 100% loss, the Commission calculates 25% of 250 weeks, which equals 62.5 weeks. *See* Gilbert, *et al.*, *Maryland Workers' Compensation Handbook*, § 9.03[4][b] at 9-13; *see, e.g.*, *Anderson*, 192 Md. App. at 345.

For injuries that qualify as "other cases" under LE § 9-627(k), the Commission first determines the percentage by which the "industrial use" of the employee's whole body was impaired by the occupational disease (or accidental injury). In making that determination, the Commission also must consider "the nature of the physical disability" and "the age, experience, occupation, and training" of the employee at the time the occupational disease (or accidental injury) occurred. LE § 9-627(k)(2); *see* Gilbert, *et al.*, *Maryland Workers'*

---

(k) Other cases.

(1) In all cases of permanent partial disability not listed in subsections (a) through (j) of this section, the Commission shall determine the percentage by which the industrial use of the covered employee's body was impaired as a result of the accidental personal injury or occupational disease.

(2) In making a determination under paragraph (1) of this subsection, the Commission shall consider factors including:

(i) the nature of the physical disability; and

(ii) the age, experience, occupation, and training of the disabled covered employee when the accidental personal injury or occupational disease occurred.

(3) The Commission shall award compensation to the covered employee in the proportion that the determined loss bears to 500 weeks.

(4) Compensation shall be paid to the covered employee at the rates listed for the period in §§ 9-628 through 9-630 of this Part IV of this subtitle.

*Compensation Handbook*, § 9.03[4][c] at 9-17. The Commission then determines the number of weeks compensation is to be awarded by apportioning the loss, using 500 weeks as the starting point. For example, for a 10% "other cases" disability, the Commission would award 50 weeks of compensation. *See id.* § 9.03[4][c] at 9-17.

With respect to hearing loss, the statute identifies "the total loss of hearing of 1 ear" and "the total loss of hearing of both ears" as scheduled losses, with 125 weeks of compensation for one ear and 250 weeks of compensation for two ears. LE § 9-627(d)(2). For Mr. Bowen, the Commission ordered that he receive payments for hearing loss to both ears as a scheduled loss under LE § 9-627(d)(2), for a duration proportional to 14.875% of 250 weeks. The Commission also awarded permanent partial disability benefits for tinnitus as an unscheduled or "other cases" loss under LE § 9-627(k), for a duration proportional to 2% of 500 weeks for an "industrial loss of use of the body."

## C. Analysis

The County argues *first* that the Commission erred in using the results of Mr. Cochran's earlier-in-time audiogram that showed more hearing loss. The County does not challenge the reliability of that audiogram, but instead challenges the Commission's interpretation of LE § 9-650 in calculating Mr. Cochran's average hearing loss. The County argues *second* that the Commission should have calculated the deduction for age based on the years between Mr. Cochran's 50th birthday and the date of his audiogram. We discuss the first legal challenge in the first section, and address the second one—which overlaps with a question raised in Mr. Bowen's case—in the next section. Finally, we address the *third* issue regarding the award for Mr. Bowen's tinnitus under LE § 9-627(k) in the last

17

section.

   *1. The Commission did not err in calculating Mr. Cochran's total average hearing loss under LE § 9-650(b)(2) by relying on the results of the audiogram that showed more hearing loss.*

The Commission found that Mr. Cochran "sustained an occupational disease of hearing loss" arising out of his employment based on the earlier audiogram performed on September 23, 2015. The County argues that the Commission erred because the applicable statute—LE § 9-650(b)(2)(i)—required the Commission to use the results of Mr. Cochran's later audiogram (performed in May 2016) because those results were "lower" than the earlier results, *i.e.*, showed less hearing loss. Mr. Cochran does not dispute that if the results of the May 2016 audiogram are used, he has no compensable occupational deafness claim. Mr. Cochran responds that the County's interpretation of LE § 9-650(b)(2)(i) is wrong and that the Commission's reliance on the September 2015 audiogram was proper. We hold that the Commission was not required to use the May 2016 results—*i.e.*, the results of the audiogram showing less hearing loss—in determining Mr. Cochran's entitlement to compensation for occupational deafness.

We begin with the language of the statute. Subsection (b) of LE § 9-650 is one of five subsections delineating the "specified technical parameters" for determining a "degree of hearing loss" for the purpose of calculating compensation. *Green*, 170 Md. App. at 518. The County contends that the term "lowest measured losses" in LE § 9-650(b)(2)(i) required the Commission to use the audiogram results showing the lowest degree of hearing loss. But as we explain below, that language does not direct the Commission to use the lowest hearing losses *ever* tested and recorded for an occupational deafness claimant.

18

Instead, it sets forth a procedure and formula for calculating the level of a claimant's hearing loss during a single audiogram, and doesn't dictate which results among multiple audiograms the Commission must select.

Placing the language of subsection (b) in the context of LE § 9-650's other four subsections supports this view. *First*, subsection (a) requires hearing loss to be measured "by audiometric instrumentation" that meets certain technical criteria:

> (a)(1) Hearing loss shall be measured by audiometric instrumentation that meets the following criteria:
>
> > (i) ANSI 3.6-1996;
> >
> > (ii) ANSI S3.43-1992; and
> >
> > (iii) ANSI 3.39-1987 or any ANSI standard that supersedes the previous calibration or measurement criteria.
>
> (2) Measurements shall be conducted in a sound room that meets the ANSI 3.1-1991 criteria for maximum permissible ambient noise for audiometric test rooms.
>
> (3) Behavioral psychoacoustic measurements shall be obtained with instrumentation that utilizes insert earphones, as referenced in ANSI 3.6-1996.
>
> (4) Electrodiagnostic measurements such as auditory evoked potentials, acoustic emittance measurements, or distortion product otoacoustic emissions may be obtained to determine the nature and extent of workplace hearing loss.
>
> (5) Audiologic results shall be used in conjunction with other information to evaluate a claimant's compensable hearing loss.

LE § 9-650(a). *Next* comes subsection (b), which states the mathematical formula the Commission must use to calculate claimant's average "threshold[] in hearing" in each of the four frequencies (the language on which the County relies is bolded):

> (b)(1) The percentage of hearing loss for purposes of

19

compensation for occupational deafness shall be determined by calculating the average, in decibels, of the thresholds of hearing for the frequencies of 500, 1,000, 2,000, and 3,000 hertz in accordance with paragraph (2) of this subsection.

(2) The average of the thresholds in hearing shall be calculated by:

> (i) adding together **the lowest measured losses** in each of the 4 frequencies; and

> (ii) dividing the total by 4.

(3) To allow for the average amount of hearing loss from nonoccupational causes found in the population at any given age, there shall be deducted from the total average decibel loss determined under paragraphs (1) and (2) of this subsection one-half of a decibel for each year of the covered employee's age over 50 at the time of the last exposure to industrial noise.

*Third*, subsection (c) establishes the minimum level of hearing loss for a compensable occupational deafness claim (25 decibels or less), as well as the method of calculating the percentage of compensable hearing loss (1.5% of the compensable hearing loss for every decibel exceeding 25 decibels):

> (c)(1) If the average hearing loss in the 4 frequencies determined under subsection (b) of this section is 25 decibels or less, the covered employee does not have a compensable hearing loss.

> (2) If the average hearing loss in the 4 frequencies determined under subsection (b) of this section is 91.7 decibels or more, the covered employee has a 100% compensable hearing loss.

> (3) For every decibel that the average hearing loss exceeds 25 decibels, the covered employee shall be allowed 1.5% of the compensable hearing loss, up to a maximum of 100% compensable hearing loss at 91.7 decibels.

*Fourth*, subsection (d) sets forth the formula for calculating the "binaural percentage of

hearing loss," which is the percentage of hearing loss relating to both ears:[12]

> (d) The binaural percentage of hearing loss shall be determined by:
>
> (1) multiplying the percentage of hearing loss in the better ear by 5;
>
> (2) adding that product to the percentage of hearing loss in the poorer ear; and
>
> (3) dividing that sum by 6.

And *finally*, subsection (e) precludes the use of hearing aids in testing a claimant's hearing loss and contains additional requirements about the "audiologic data" relating to "bone conduction" and "air conduction":

> (e)(1) In determining the percentage of hearing loss under this section, consideration may not be given to whether the use of an amplification device improves the ability of a covered employee to understand speech or enhance behavioral hearing thresholds.
>
> (2)(i) In determining a workers' compensation claim for noise-related hearing loss, audiologic data shall use both bone conduction and air conduction results.
>
> (ii) If a conductive loss is present, the bone conduction thresholds for each ear, rather than the air conduction levels, shall be used to calculate a claimant's average hearing loss.

When interpreting statutory language, we look at its "normal, plain meaning" and consider the "context of the statutory scheme." *Bey*, 452 Md. at 265–66. We "seek to reconcile and harmonize" the statute's parts, *id. at 266*, and also to "ensur[e] that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory,

---

[12] "Binaural" means "[r]elating to both ears." Binaural, *Stedman's Medical Dictionary*. (28th ed. 2006)

and that any illogical or unreasonable interpretation is avoided." *Breslin v. Powell*, 421 Md. 266, 287 (2011) (cleaned up). As an initial matter, neither subsection (b) nor any other subsection of LE § 9-650 references multiple or alternative audiograms. Instead, the statute sets forth—in great detail—the type of room and instruments that must be used when measuring the claimant's hearing, as well as the mathematical formula for determining whether the hearing loss is compensable. The statute, given its plain and ordinary meaning, and read in context, does not contemplate a situation in which more than one audiogram was taken. Instead, it contemplates a situation in which several measurements are taken in the same frequency, and the lowest one (*i.e.*, the one showing the least amount of hearing loss *on that day*) is used in the formula.

To be sure, the statute does not expressly state that its parameters apply to various measurements taken in a single audiogram—indeed, the absence of such an express statement is what gives the County a foothold to argue as it does. But the County's interpretation would lead to absurd results—for example, the requirement that the results for each of the four relevant frequencies from different audiograms be plugged into the formula in order to capture the lowest-ever-recorded hearing loss in each frequency. We decline to hold that in passing LE § 9-650, the General Assembly intended to require (or even allow) a piecemeal combination of different test results. If the legislature had intended to include requirements for choosing between the results of audiograms taken on different days, it could have done so, and it didn't.

The County also suggests, without citation, that the Commission erred in relying on the earlier-in-time audiogram and, in fact, was required to use the later audiogram: "Even

if there were no requirement for the Commission[] to use the lowest measured losses, it is clear that the most recent hearing test is the test that must be used. If the condition has improved to the degree that there is no longer a compensable loss, then the claim is not compensable." But the County's assertion that the earlier-in-time audiogram was incorrect is pure speculation. The County doesn't claim that the audiogram was procedurally or otherwise flawed, and identifies nothing in the record—expert testimony or otherwise—to support its assertion that a later-in-time audiogram is the most accurate reflection of a claimant's hearing loss.

> 2. *The Commission did not err in calculating the deduction of decibels from Mr. Cochran's and Mr. Bowen's total average hearing losses by counting the number of years between each firefighter's 50th birthday and the dates they retired from service.*

The Commission calculated the deduction from Mr. Cochran's total average hearing loss under LE § 9-650(b)(3) by counting the number of years between his 50th birthday (November 16, 2006) and the date he retired (November 2013), which was approximately seven years. The Commission similarly calculated the deduction from Mr. Bowen's total average hearing loss by counting the number of years between his 50th birthday (March 5, 2007) and the date he retired (September 2013), which was approximately six years. The County argues that those calculations were improper under LE § 9-650(b)(3) and that the calculation should be based on the number of years between each firefighter's 50th birthday and the dates their audiograms were performed. Messrs. Cochran and Bowen respond that it was not error for the Commission to use the retirement dates because, under the language of the statute, the years are to be counted from the claimant's "last exposure to industrial

23

noise," which for Messrs. Cochran and Bowen would have been, at the latest, their respective retirement dates. We hold that the Commission did not err in calculating the deduction by counting the number of years between each firefighter's 50th birthday and the dates they retired from service.

Again, we begin with the plain language, this time of LE § 9-650(b)(3). As we explained previously, the first step in determining whether a claimant has compensable occupational deafness is to "add[] together the lowest measured losses in each of the 4 frequencies" and "divid[e] the total by 4." LE § 9-650(b)(2)(i). From there, the Commission deducts from that number "one-half of a decibel for each year of the covered employee's age over 50 at the time of the last exposure to industrial noise":

> (b)(3) To allow for the average amount of hearing loss from nonoccupational causes found in the population at any given age, there shall be deducted from the total average decibel loss determined under paragraphs (1) and (2) of this subsection one-half of a decibel for each year of the covered employee's age over 50 *at the time of the last exposure to industrial noise*.

LE § 9-650(b)(3) (emphasis added.) Subsection (b)(3) does not reference the date the audiogram was performed. Instead, the relevant point in time is "the last exposure to industrial noise," which the Commission interpreted as the dates the firefighters retired.

The County argues that the "last exposure to industrial noise" means the date of the audiogram. In support of that position, it argues that the term "industrial noise" includes noise to which all people are exposed in everyday life. The County goes so far as to assert that: "[i]n daily life, whether it is riding the subway system, driving by a construction site, attending a concert, running a garbage disposal, vacuuming the floor, flying in a plane, or

24

the like, everyone is exposed to industrial noise." Based on that assertion, the County argues that the statute does not "limit the age reduction to industrial exposure generated at the employer . . . ."

The County's interpretation is wrong. Although it is true that the Act does not define the term "industrial noise," we still know something about what the General Assembly meant by that term. On its face, it does not mean the date of the audiogram—the phrasing does not capture the date a hearing test was conducted as the date of "last exposure to industrial noise." And indeed, we do not see how the County's definition of "industrial noise" as loud noises encountered in everyday life supports the date of the audiogram as the operative date: if workers' compensation claimants (and we too) are exposed constantly to "industrial noise" in their everyday lives, there could never be a "last exposure."

The purpose of the Act—to compensate claimants for injuries connected to the workplace—also defeats the County's position, as does the language of other sections addressing occupational deafness. LE § 9-505 defines claimants' rights to compensation for occupational deafness. The first of two subsections contains the term "industrial noise": subsection (a) requires employers to compensate employees for "loss of hearing [] due to *industrial noise* in the frequencies of 500, 1,000, 2,000, and 3,000 hertz" (emphasis added). And the second subsection provides additional support—subsection (b) goes on to limit the liability of employers by requiring the employee to be exposed to "harmful noise" *in the workplace* for at least 90 days: "An employer is not liable for compensation for occupational deafness under subsection (a) of this section unless the covered employee claiming benefits worked for the employer in employment that exposed the covered

25

employee to harmful noise for at least 90 days." LE § 9-505(b). That section does not reference or hint at any form of noise other than noise to which the employee was exposed on the job.[13]

The County counters with an example that, it says, would lead to absurd results. It posits two 65-year-old firefighters with the same degree of hearing loss who both file claims at age 65. One retires at 65 and is subject to 15 years' worth of decibel deductions, while the other retires at 50 and is subject to zero deductions. The County suggests that the latter would unjustly receive some kind of a windfall. But the County's hypothetical ignores the fact that the firefighter who retired at 50 would have not been receiving any benefits during the intervening fifteen years. And that aside, when the language of a statute is unambiguous, as here, it's the judiciary's role to interpret its plain language. LE § 9-650(b)(3) means what it says: the deduction reflects the number of years between the

---

[13] We reject the County's reliance on the terms "average amount" and "nonoccupational" in the phrase "[t]o allow for the average amount of hearing loss from nonoccupational causes . . . ." to support its interpretation of LE § 9-650(b)(3). As best we can understand, the County believes that this phrase indicates that the General Assembly "recognize[d] that there are 'nonoccupational' exposures to 'industrial noise' found in the population at any given age, whether it be from being on [an] airplane, in busy traffic, or vacuuming the house." Therefore, the argument goes, "no fact finding is required to determine if the claimant had a particular [last] exposure to industrial noise," because ½ of a decibel is deducted for everyone for each year between a claimant's 50th birthday and the date the test was taken. But this results in a tortured interpretation of the term "last exposure" and ignores the "normal, plain meaning" of the statute's words. *Bey*, 452 Md. at 265–66. "Last" exposure means what it says: the last point in time that a claimant was exposed to harmful noise at work; the County's interpretation would write out the term "last" from the statute.

Messrs. Cochran and Bowen filed a motion for leave to file supplemental briefs addressing this argument. They justify this request by arguing that this issue has come up in subsequent cases, even though it wasn't briefed or argued here. The motion has been denied by separate order.

claimant's 50th birthday and his last exposure to harmful noise at work,[14] even if the audiogram is taken years after that last exposure. The result may mean that the County pays benefits in cases where it would prefer not to, but again, the statute has no requirement that the audiogram be taken contemporaneously with the last exposure to industrial noise, and we decline to read such a requirement into the statute. We find no error in the Commission's conclusion that Messrs. Cochran's and Bowen's last exposure to harmful noise at work was the date of each firefighter's respective retirement.

3. *The Commission erred in awarding Mr. Bowen permanent partial disability benefits for tinnitus under LE § 9-627(k).*

The Commission awarded Mr. Bowen permanent partial disability benefits for 14.875% of 250 weeks for hearing loss to both ears pursuant to LE § 9-627(d)(2) *plus* 2% of 500 weeks for an "industrial loss of use of the body" due to his tinnitus under LE § 9-627(k). The County argues that the award for tinnitus was in error. We agree, although not for the reason the County argues primarily. The threshold question is one of first impression: is compensation for tinnitus determined under LE § 9-502, as an ordinary occupational disease, or under LE § 9-505 and LE § 9-650, as part of occupational deafness? We hold that unless and until the General Assembly says otherwise, compensation for tinnitus is analyzed under LE § 9-502 as an occupational disease. The reason for this is straightforward: the plain language of LE § 9-505 and LE § 9-650 does not include tinnitus. Because Mr. Bowen sought compensation for tinnitus as part of his

---

[14] The County's other argument, which concerns LE § 9-651 and § 9-652, is a variation of its argument that "industrial noise" includes noise beyond noise to which a claimant is exposed at work, and we reject it for the same reasons.

occupational deafness claim and did not attempt to establish disablement, the Commission erred in awarding him benefits for tinnitus.[15] *Belschner*, 227 Md. at 93; *see Miller*, 310 Md. at 187.

The foundational basis for compensation for occupational deafness is LE § 9-505, which we reproduce again to highlight that it does not reference tinnitus, and instead references only "loss of hearing" in certain specified frequencies:

> Except as otherwise provided, an employer shall provide compensation in accordance with this title to a covered employee for loss of hearing by the covered employee due to industrial noise in the frequencies of 500, 1,000, 2,000, and 3,000 hertz.

LE § 9-505(a). In addition to considering LE § 9-505 to determine compensability for occupational deafness, the Commission must also determine whether a claimant meets the criteria set forth in LE § 9-650. *Green*, 398 Md. at 526 (LE § 9-505 and LE § 9-650 are "complementary" and the requirements of both must be met to receive benefits for occupational deafness). Those technical parameters get into the weeds of measuring hearing loss in certain frequencies, including specific criteria for the instrumentation, sound room, and earphones that must be used for audiograms.

But the County does not identify, and we did not find, anything in the statute or the

---

[15] The County makes this argument, but only as an alternative and in a footnote. It says that it does not "concede" that tinnitus is compensable outside of claims for occupational deafness under LE § 9-505 and LE § 9-650. The practical outcome of the County's main position is that tinnitus would likely *never* be compensable because it is not measurable, as occupational deafness is. Ultimately, though, the County's argument fails because the plain language of the statute does not include tinnitus within occupational deafness, as we explain herein.

record to support the view that the General Assembly intended to encompass tinnitus within occupational deafness under LE § 9-505 and LE § 9-650. Nothing before us suggests that the "hertz" unit of measurement referenced in both sections is meant to capture the ringing in the ears characteristic of tinnitus or the extent to which that ringing interferes with hearing. To the contrary, the record indicates that tinnitus is not measurable by instrumentation at all. Both parties rely on the *Guides to the Evaluation of Permanent Impairment* (American Medical Association, Fourth Edition, 1993), a resource incorporated by reference into the Commission's regulations. COMAR 14.09.09.01. We discuss the *Guides* in more detail below, but the section concerning tinnitus states expressly that "[d]isturbances of the ear, such as chronic otorrhea, otalgia, and tinnitus, ***are not measurable***" (emphasis added). Of course, we do not decide the factual question of whether tinnitus is measurable or, if it is not, how it ought to be evaluated. All we decide here—and as a court, all we are equipped to decide—is that the plain language of the occupational deafness statutes do not encompass tinnitus.

In support of its assertions that "hearing loss causes tinnitus" and that tinnitus is "part of" hearing loss and occupational deafness, the County also relies on the *Green* case. 170 Md. App. 845, *aff'd*, 398 Md. 512. But that question was neither considered nor decided in the *Green* opinions. Indeed, the term "tinnitus" appears just once in each of them, in the background sections, in the courts' reproduction of a quote from the claimant's physician stating that "[t]his noise exposure and hearing loss is likely also the cause of the factors for [Mr. Green's] bilateral tinnitus." *Green*, 398 Md. at 515; *Green*, 170 Md. App. at 505. The question of whether the claimant's tinnitus was compensable as occupational

deafness under LE § 9-505 and LE § 9-650 was not at issue. Instead, this Court held, and the Court of Appeals affirmed, that the claimant was not entitled to reimbursement for hearing aids because he did not have enough hearing loss under the technical criteria of LE § 9-650 to qualify for benefits. *Green*, 398 Md. at 526.

The County also relies on the American Medical Association's *Guides to the Evaluation of Permanent Impairment*. Again, the *Guides* are incorporated by reference into the Commission's regulations. COMAR 14.09.09.01. The *Guides* come into play when a claimant submits an expert's written evaluation of his permanent impairment. COMAR 14.09.09.03(B)(2). The regulations require a physician, psychologist, or psychiatrist to "[u]se the numerical ratings for the impairment set forth in the [*Guides*] . . . ." COMAR 14.09.09.03. And it is true that the *Guides* provide that, when a claimant has tinnitus, "an impairment percentage up to 5% may be added to the impairment for hearing loss." The County also points to the experts' reports in this case, and asserts that "both parties' experts agree that tinnitus is part of hearing loss." But whatever the *Guides* and the experts might say about the rating of tinnitus does not dictate or determine our interpretation of the statute.[16] *See Baltimore Cty. v. Quinlan*, 466 Md. 1, 16 (2019) ("Indeed, '[t]he language of

---

[16] And even if we were to consider the language of the *Guides*, its discussion of hearing loss and tinnitus does not support the County's assertion that tinnitus is "part of" hearing loss. Chapter 9 of the *Guides* is titled "Ear, Nose, Throat, and Related Structures." Subsection 9.1 of the chapter is titled "The Ear" and explicitly distinguishes hearing loss from conditions such as tinnitus:

> Disturbances of the ear, such as chronic otorrhea, otalgia, and tinnitus, are not measurable. Therefore, the physician should estimate an impairment percentage based on the severity of those conditions and the degree to which they interfere with

a statute is its most natural expositor, and, where the language is susceptible of a sensible interpretation, is not to be controlled by any extraneous considerations.'") (*quoting Victory Sparkler & Specialty Co. v. Francks*, 147 Md. 368, 378 (1925)).

In sum, nothing on the face of LE § 9-505 or § 9-650 suggests that the General Assembly intended workers' compensation for occupational deafness to cover anything other than hearing loss measurable by loss of decibels in four specified frequencies, measured in hertz, that meets the threshold established by the mathematical formula in LE § 9-650. But we hold nevertheless that the Commission erred in awarding permanent partial disability benefits to Mr. Bowen for tinnitus under LE § 9-627(k) because Mr. Bowen made no showing, and the Commission accordingly made no finding, that he had a "disablement," a prerequisite to workers' compensation benefits for an occupational disease under LE § 9-502.

That said, a case where a disablement from tinnitus is established, we see nothing improper in an award of permanent partial disability benefits for tinnitus as an "other cases"

---

functions of the ear, and a percentage that is consistent with established values.

Tinnitus in the presence of unilateral or bilateral hearing loss may impair speech discrimination; therefore, an impairment percentage up to 5% may be added to the impairment for hearing loss.

Subsection 9.1a is titled "Hearing" and it discusses "permanent hearing impairment" and goes on summarize in prose the technical parameters and mathematical formulas for measuring hearing loss that are set forth in LE § 9-650. But it contains no mention of tinnitus, and no suggestion that tinnitus can be measured by those parameters. And this makes sense, given that the *Guides* explicitly recognize in the immediately preceding section that "tinnitus is not measurable."

injury under LE § 9-627(k). Put another way, the Commission was not incorrect insofar as it categorized Mr. Bowen's tinnitus—a condition that causes him to experience "constant," "ongoing," "24/7" ringing in his ears and that affects his ability to communicate and socialize effectively with others and to sleep—as an "unscheduled" or "other cases" loss under LE § 9-627(k), and not as a "scheduled" injury under LE § 9-627(d)(2)(i–ii) for the "loss of hearing of 1 ear" or the "loss of hearing of both ears." If the General Assembly sees fit to eliminate disablement as a requirement to awarding compensation for tinnitus as it did for occupational deafness, then it can do so. *See Yox*, 149 Md. App. at 717 (recognizing that "LE section 9-505 was enacted out of a legislative recognition that an injured worker could be left without a remedy in an occupational hearing loss case because, in such cases, there is often no attendant disability" (cleaned up)).

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN NO. 662, SEPT. TERM 2018 AFFIRMED. APPELLANT TO PAY COSTS. JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN NO. 2930, SEPT. TERM 2018 AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE DIVIDED EQUALLY.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0662s18cn.pdf